1  JOSEPH P. RUSSONIELLO (CASBN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CABN 163973)
3  Chief, Criminal Division

4  MERRY JEAN CHAN (CASBN 229254)
   Assistant United States Attorney
5
      450 Golden Gate Avenue, 11th Fl.
6     San Francisco, CA 94102
      Telephone: (415) 436-6750
7     Facsimile: (415) 436-6470
      Email: merry.chan@usdoj.gov
8
   Attorneys for Plaintiff
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                  OAKLAND DIVISION

13  UNITED STATES OF AMERICA,       )   No. CR 04-40016 CW
                                    )      C 08-02393 CW
14          Plaintiff,              )
                                    )   UNITED STATES'S OPPOSITION
15     v.                           )   TO DEFENDANT'S *PRO SE*
                                    )   MOTION FILED UNDER 28 U.S.C. §
16  SHARON LEE CAULDER,             )   2255 TO VACATE, SET ASIDE, OR
                                    )   CORRECT SENTENCE
17          Defendant.              )
                                    )   Court: Hon. Claudia Wilken
18  ————————————————————————————————)

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   I. Legal standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

  II. Defendant's claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.    "Conviction obtained by violation of the 1st Amendment - obstruction of persons in the free exercise of their religion". . . . . . . . . . . . . . . . . . . . . . 4

       B.    "Conviction obtained by violation of attorney-client confidentiality privilege". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       C.    "Conviction was obtained by violation of the 6th Amendment. I was denied the right to be tried by an impartial jury". . . . . . . . . . . . . . . . . . . . . 6

       D.    "Conviction obtained by coersion with threat of loss of attorney-client confidentiality privilege". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       E.    "Conviction obtained by violation of appropriate strategies, by trial counsel, concerned with impeachment of government witness on the stand". . . . . . 7

       F.    "Conviction obtained by withholding information about mental state of defendant during time of the instant offenses". . . . . . . . . . . . . . . . . . . . . 9

       G.    "Conviction obtained by violation of the right to be advised of plea agreements presented by the government". . . . . . . . . . . . . . . . . . . . . . 10

       H.    "Defense counsel's failure to object to prejudicial testimony which was used to inflame minds of jury, constitutes ineffective assistance". . . . . . . 10

       I.     "Trial counsel's failure to object to irrelevant and unduly prejudicial statements which implied that petitioner was a dangerous and scandalous scam artist, an unsavory character merely to show that I am a bad person and thus more likely to have committed the crime, constituted ineffective assistance of counsel". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       J.    "Conviction obtained by denial of effective assistance of counsel". . . . . . 11

       K.    "Conviction obtained by denial of effective assistance of counsel". . . . . . 12

       L.    "Counsel refused to object to erroneous evidence". . . . . . . . . . . . . . . . . 14

M.    "Government witness was bribed by IRS and FBI"................. 15

N.    "Counsel failed to object to testimony by the government witness negative to the defendant's character"..................................... 15

O.    "Conviction obtained by failure to notify accused of Grand Jury commencement or outcome".................................... 16

P.    "Counsel did not object to situations that encouraged the jury to believe that the defendant was a notorious criminal"........................... 16

Q.    "Where counsel passes over clearly inadmissible evidence, which is prejudicial to defendant has no strategic value and constitutes ineffective assistance of counsel". ....................................... 17

R.    "Joinder of cases detrimental to defendant's case".................. 17

CONCLUSION. ....................................................... 20

**TABLE OF AUTHORITIES**

FEDERAL CASES

*Bousley v. United States*, 523 U.S. 614 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . 7

*Massaro v. United States*, 538 U.S. 500 (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Anderson*, 642 F.2d 281 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Braswell*, 501 F.3d 1147 (9th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Cabrera*, 222 F.3d 590 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Chacon-Palomares*, 208 F.3d 1157 (9th Cir. 2000). . . . . . . . . . . . . . 3

*United States v. Charles*, 456 F.3d 249 (9th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Foster*, 57 F.3d 727 (9th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Giese*, 597 F.2d 1170 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . 12-13

*United States v. Howard*, 381 F.3d 873 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . 4, 12

*United States v. Jawara*, 474 F.3d 565 (9th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Leonti*, 326 F.3d 1111 (9th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir. 2005).. . . . . . . . . . . . . . . . 16

*United States v. Schaflander*, 743 F.2d 714 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Terry*, 911 F.2d 272 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*United States v. VonWillie*, 59 F.3d 922 (9th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . 19, 20

*Weeks v. Angelone*, 528 U.S. 225 (2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

FEDERAL STATUTES AND RULES

18 U.S.C. § 152(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 17

26 U.S.C.§ 7203.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 17

Fed. R. Crim. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

Fed. R. Crim. P. 14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

Fed. R. Evid. 615(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**INTRODUCTION**

On May 8, 2008, the defendant filed a motion under 28 U.S.C. § 2255 to vacate, set, aside, or correct her sentence *pro se*.  On May 12, 2008, this Court ordered the United States to respond by June 4, 2008.

The defendant lists eighteen grounds for relief in her motion.  In the main, she alleges that her trial counsel provided her with ineffective assistance.  The defendant also claims that she was deprived of her Sixth Amendment right to be tried by an impartial jury because of faulty jury instructions; that a government witness was bribed by the IRS and FBI with compensation for his testimony; that this Court erred in failing to sever her bankruptcy fraud charges from her failure to file tax return charges; and that she was deprived of notice of a grand jury trial.

All of these claims should be dismissed because they are insufficiently supported by specific factual assertions, procedurally defaulted, and/or meritless.

**FACTUAL BACKGROUND**

On April 14, 2005, a federal grand jury sitting in the Northern District of California returned a superseding indictment against the defendant charging her with multiple counts of concealing assets in connection with a bankruptcy proceeding, in violation of 18 U.S.C. § 152(1), and willfully failing to file tax returns from 1998 to 2002, in violation of 26 U.S.C. § 7203.  *See* Court Record ("CR") 27.  After heavy litigation, in which the defendant moved to dismiss a count, *see* CR 30, sever six counts, *see* CR 31, strike surplusage in the superseding indictment, *see* CR 61, transfer the case to another district, *see* CR 65, exclude a government witness or conduct psychiatric examination of him, *see* CR 95, and compel discovery, *see* CR 96, the defendant was brought to trial before a jury on November 14, 2007.  *See* CR 193.

At trial, the United States put on evidence showing that between 1998 and 2002, the defendant earned approximately $1.7M as a therapist, and purchased two horses, a Mercedes Benz, a house in the Oakland Hills, and a condominium in Hawaii.  *See* Trial transcript ("Tr.") 732-54.  Despite her income, the defendant failed to file a tax return for

any of the five years, and in fact, in 1998, obtained relief from $184,000 in debts through a bankruptcy proceeding in which she concealed her substantial assets. *See id.*

Much of the evidence against the defendant was indisputable and undisputed, and in consultation with the defendant, defense counsel decided not put on an affirmative case. *See* Tr. 689-90. However, defense counsel argued that the defendant lacked the necessary intent to be found guilty of the bankruptcy and tax charges. Defense counsel argued that the defendant had relied on her bankruptcy lawyer's expertise during the bankruptcy proceedings, and any errors in her paperwork should be attributed to him and not her. *See* Tr. 265-66, 756-58. Defense counsel also argued that the defendant had not willfully failed to file tax returns; at most, she had been negligent, and the main source of her income, government witness Michael de la Cruz, had misled her into thinking that many of his payments to her were tax-free gifts. *See* Tr. 269-71, 759-62.

Reflecting the defense strategy's emphasis on whether the government had met its burden of proof regarding the defendant's state of mind, this Court instructed the jury that they could not find the defendant guilty of bankruptcy fraud unless they found that she had knowingly and fraudulently concealed assets. *See* Tr. 718. This Court provided definitions for the terms knowingly and fraudulently, and discussed how the jury might infer intent. *See* Tr. 719-20. This Court also provided an instruction on the good faith defense, explaining that good faith on the part of the defendant was inconsistent with the intent to defraud alleged in the bankruptcy fraud charges. *See* Tr. 721-22. With respect to the tax charges, this Court instructed the jury that they could not find the defendant guilty unless they found that she had acted willfully in failing to file her tax returns. *See* Tr. 727. This Court explained that gifts are not taxable income, and that willfulness was more than ignorance, mistake, or accident. *See* Tr. 729-30. The jury could only find that the defendant willfully failed to file her tax returns if they found that she had failed to comply with her known legal duty voluntarily and intentionally, and good faith on the part of the defendant was a complete defense. *See* Tr. 720-31.

On November 18, 2005, a jury found the defendant guilty of all counts charged:

1  two counts of concealing assets in connection with a bankruptcy proceeding, in violation

2  of 18 U.S.C. § 152(1), and five counts of willfully failing to file tax returns from 1998 to

3  2002, in violation of 26 U.S.C. § 7203.  *See* CR 198-99.  This Court sentenced the

4  defendant to 30 months in prison, permitting the defendant to remain out of custody

5  pending her appeal.  *See* CR 228; Tr. May 31, 2006 at 42-43.

6      The defendant filed an appeal challenging this Court's legal instructions regarding

7  bankruptcy law, denial of the defendant's motion to disclose government witness de la

8  Cruz's mental health records, grant of the United State's in limine motion to restrict

9  inquiry into witness's mental health history, and sentence.  *See* CR 235, 242; Brief of

10 Appellant.  The Ninth Circuit denied the defendant's appeal, affirming this Court's

11 judgment.  *See* CR 269.  On January 11, 2008, the defendant self-surrendered to begin

12 serving her sentence.  *See* CR 265.

13     The defendant filed a *pro se* motion to vacate her sentence under 28 U.S.C. § 2255

14 on May 8, 2008.  *See* CR 277.  This Court ordered the United States to respond by June 4,

15 2008.  *See* CR 279.

16                                    **ARGUMENT**

17 **I.  Legal standards**

18     Generally, "claims not raised on direct appeal may not be raised on collateral

19 review unless the petitioner shows cause and prejudice."  *Massaro v. United States*, 538

20 U.S. 500, 504 (2003).

21     "When a prisoner files a § 2255 motion, the district court must grant an evidentiary

22 hearing [u]nless the motion and the files and records of the case conclusively show that

23 the prisoner is entitled to no relief.  Evidentiary hearings are particularly appropriate

24 when claims raise facts which occurred out of the courtroom and off the record."  *United*

25 *States v. Chacon-Palomares*, 208 F.3d 1157, 1159 (9th Cir. 2000) (internal citations,

26 quotations omitted).  However, where the defendant fails to allege specific facts which, if

27 true, would entitle her to relief, or where the allegations are "bald, conclusory or

28 incredible assertions," the district court may dismiss the motion without an evidentiary

hearing. *United States v. Howard*, 381 F.3d 873, 877, 879 (9th Cir. 2004); *see United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984).

To state a claim of ineffective assistance of counsel, the defendant must identify acts or omissions on the part of her counsel that under the circumstances were outside the wide range of professionally competent assistance, and that there was a reasonable probability that but for these unprofessional errors, the result of the proceeding would have been different and more beneficial to the defendant. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

## II. Defendant's claims

### A. "Conviction obtained by violation of the 1st Amendment - obstruction of persons in the free exercise of their religion"

The defendant claims that her religion was improperly used in the prosecution of this bankruptcy fraud and tax case. *See* Def. § 2255 Mot., Ground One. In support of this claim, she states that defense counsel failed to object to highly prejudicial remarks relating to her religion during her bond hearing, and that bond was in fact denied based on her religion. *See id.* This factual assertion is insufficiently specific to permit this Court to grant the defendant either relief or an evidentiary hearing. *See Howard*, 381 F.3d at 877. The defendant does not explain what remarks pertaining to her religion she believes were highly prejudicial, and it is unclear what bond hearing she means. In fact, her assertion is baseless since she remained out of custody until she self-surrendered after the Ninth Circuit Court of Appeals denied her appeal. *See* Tr. May 31, 2006 at 42-43; CR 263.

The defendant's other allegations listed under this heading claim that her trial counsel failed to object to highly prejudicial remarks made by this Court and the prosecutor relating to her religion. Again, she fails to specify what remarks she considered to be highly prejudicial. In fact, the record shows that no remarks or argument regarding the defendant's religion were ever made to the jury. This Court made no comments about the defendant's religion whatsoever, and explicitly instructed the jury that the defendant was not on trial for any conduct or offense not charged in the

indictment.  *See* Tr. 715, 728.

This Court also precluded evidence of the defendant's religious beliefs, explaining that reference to the defendant's religion of Vodun would not result in mistrial, since the defendant had advertised her services as a healer whose qualifications included her practice of Vodun and authorship of a book on Vodun.  *See* Tr. Nov. 7, 2005 at 57, 63-65. However, the Court did not want the defendant's religious beliefs to be "overemphasized." *See id.* at 65.  The United States complied with the Court's instruction.  The closest to any mention of the defendant's religion by the prosecutor was during opening statement, when the prosecutor said that the evidenc would show that the defendant worked as a "therapist" and called herself a "shaman psychologist" in some of the advertisements for her services that she placed.  *See* Tr. 255.  The only evidence regarding the defendant's religion were contained in paid advertisements for the defendant's healing services in which the defendant stated that she was a shaman psychologist, an African Chief Vodun, and the author of "Mark of Voodoo."  *See* Exhibit 64-1 to 64-10.  These were admitted to prove that the defendant had an income-generating business providing healing services, and that she generated royalties for her book, and that as a consequence she had a duty to file tax returns.  *See* Tr. 736, 744.  The prosecutor never made any improper argument or appealed to jury prejudice based on this incidental evidence of the defendant's religious beliefs.  *See* Tr. 730-54.  In fact, in rebuttal argument, government counsel specifically stated that "[a]ny reference to prejudice has no place in this case."  Tr. 765.

**B.  "Conviction obtained by violation of attorney-client confidentiality privilege"**

The defendant claims that her defense trial violated her attorney-client privilege by conveying privileged information to the prosecutor, and states that this violation of her privilege was documented.  *See* Def. § 2255 Mot., Ground Two.  However, the defendant provides no specific details regarding what privileged information she believes was inappropriately conveyed, who conveyed this information, or what documentation exists to this effect.  Nor does she state what prejudice she might have suffered from such

communications, which would constitute ineffective assistance of counsel meriting relief.

### C. "Conviction was obtained by violation of the 6th Amendment.  I was denied the right to be tried by an impartial jury"

The defendant claims that the district court failed to properly instruct the jury.  *See* Def. § 2255 Mot., Ground Three.   The defendant is vague about what error she is alleging, but states that the jury instruction should not have directed the jury to pay any attention to her state of mind at the time of the offense.  First, this claim is procedurally defaulted; any claim regarding jury instructions should have been raised to the Court of Appeals on direct appeal.  Second, the district court was correct to instruct the jury that the defendant could not be convicted if she did not have the requisite mens rea.  *See* Tr. 718-20, 721-22, 727, 730-31.  The United States's had the burden of proof to show that the defendant had the intent to conceal assets in connection with her bankruptcy proceeding.  *See* Tr. Nov. 10, 2005 at 23.  And in fact, the defendant's entire defense was that she did not have the intent to conceal assets in her bankruptcy proceeding, and that she did not willfully fail to file her tax returns.  This was the defendant's strongest defense since the evidence showed indisputably that certain assets she held at the time were never disclosed during the bankruptcy proceedings, and that she had failed to file tax returns in years when her income required her to do so.

### D. "Conviction obtained by coersion with threat of loss of attorney-client confidentiality privilege"

The defendant also claims that her attorney refused her request for witness testimony during trial, characterizing this as a threat of loss of attorney-client privilege, which ultimately resulted in her conviction.  *See* Def. § 2255 Mot., Ground Four.  This appears to be a claim that her trial counsel rendered ineffective assistance.

It is unclear which witness(es) the defendant wanted to testify, and there is no reason to believe that defense counsel's decision not to call such witness(es) was professional incompetent, or that any such testimony would have altered the outcome of the trial.  Thus, the defendant does not make a prima facie claim of ineffective assistance.

As for the threat of loss of attorney-client privilege, it may be that the defendant is

referring to the privilege she held with her bankruptcy attorney, Claude Ames.  If the
defendant had raised an advice of counsel defense on her bankruptcy fraud charges by
either testifying that Ames had told her to conceal assets, or by presenting Ames's
testimony to the same effect, she would have destroyed any privilege she had with respect
to his counsel.  *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir.
1992).  It is possible that defense counsel explained this consequence to the defendant,
and she interpreted it as a threat or coercion.  However, the record shows that the defense
counsel discussed with the defendant her privilege with Ames, and that although Ames
was subpoenaed for trial, *see* Tr. Nov. 10, 2005 at 3-6, a tactical decision was made not to
waive the privilege.  *See*  Tr. Nov. 7, 2005 at 2, 68-71 (defense counsel telling this Court,
in defendant's presence, "I have met with Ms. Caulder and talked with her about the case
and read the discovery, and as of right now, I have made a decision not to waive privilege
vis-a-vis Mr. Ames, but it maybe . . . as the case progresses [saying "My lawyer told me
this"] becomes a necessary statement.").

Defense counsel argued that it was clear from the fact that the defendant had hired
a bankruptcy attorney that the bankruptcy attorney was responsible for all of the false
statements on her bankruptcy petition.  *See* Tr. 756-58; *see also* Tr. 265-66.  The
defendant has not presented any reason to believe that Ames would have provided any
favorable testimony, and indeed, if he had testified to the contrary – stating that the
defendant had concealed her assets from him, the defense counsel could not have made
the blame-shifting argument effectively.

### E.  "Conviction obtained by violation of appropriate strategies, by trial counsel, concerned with impeachment of government witness on the stand"

The defendant claims that trial counsel failed to proceed effectively when a
government witness impeached himself.  *See* Def. § 2255 Mot., Ground Five.  She fails to
specify which witness or how defense counsel failed to proceed effectively.  She also fails
to allege a link between such ineffectiveness and her conviction.  As such, she fails to
state a prima facie claim of ineffective assistance of counsel, which this claim seems best

1    construed as.

2          In fact, if the defendant is referring to the testimony of government witness

3    Michael de la Cruz, the record shows that defense counsel worked vigorously to impeach

4    him.  *See* Tr. 523-96.  During a lengthy cross-examination, defense counsel suggested that

5    payments de la Cruz made to the defendant were actually non-taxable gifts, *see* Tr. 525,

6    or at least that he had tricked her into thinking that they were, *see* Tr. 568, 572-81, 584-

7    89.  Defense counsel suggested that de la Cruz was a financially savvy person who was

8    taking advantage of the defendant, *see* Tr. 549, that de la Cruz had plenty of money and

9    had not been harmed, *see* Tr. 550, and that de la Cruz had "buyer's remorse" and would

10   do anything to get the money he paid the defendant back, including making false reports

11   to the FBI leading to the defendant's prosecution, *see* Tr. 526-33, 595, reporting his

12   payments to the defendant as a theft loss to the IRS, *see* Tr. 533-35, and attempting to file

13   a civil lawsuit against the defendant, *see* Tr. 551.  Defense counsel suggested that de la

14   Cruz's allegations to the FBI that the defendant tortured and abused him over five years

15   of treatment were incredible and that his testimony should not be believed, *see* Tr. tr. 535-

16   46, that de la Cruz was a man of questionable morality who used prostitutes and did not

17   take responsibility for his own life and actions, *see* Tr. 546-47, and that de la Cruz was

18   some sort of a stalker who was obsessed with the defendant, *see* Tr. 547, 558-59.  Even

19   though this Court, upheld by the Ninth Circuit, restricted inquiry into witnesses's mental

20   health history, *see* Tr. Aug. 15, 2005 at 2, defense counsel suggested that de la Cruz had

21   mental health issues long predating his contact with the defendant, *see* Tr. Tr. 552-54,

22   589-91.  Defense counsel suggested that de la Cruz was motivated by anger that the

23   defendant rejected a proposal to go into business with her, *see* Tr. 593-95.  Defense

24   counsel suggested that the government had agreed not to prosecute de la Cruz for tax

25   fraud in exchange for his testimony, *see* Tr. 569; *see also* Tr. 708.

26          Defense counsel followed up on this examination in closing argument, arguing that

27   de la Cruz's testimony could not be trusted, and that the evidence showed that he had

28   misled the defendant into believing that payments he made to here were tax-free gifts –

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and that therefore her failure to file tax returns was not willful.  *See* Tr. 759-62; *see also* Tr. 269-71.  Although these arguments did not ultimately lead to the defendant's acquittal, defense counsel clearly provided effective representation with respect to de la Cruz.

**F.  "Conviction obtained by withholding information about mental state of defendant during time of the instant offenses"**

The defendant claims that defense counsel could have countered the willfulness element of her charge by "mention[ing]" her psychological disability.  *See* Def. § 2255 Mot., Ground Six.  The defendant has not explained what psychological disability she suffered at the time she committed bankruptcy fraud and during the years she failed to file tax returns that would prevent her from acting with intent.  The only potential psychological disability of which the United States is aware is the defendant's claim in 1993 that surfacing repressed memories of ritualistic abuse that she suffered through relative's practice of Vodun caused her to suffer from post-traumatic stress syndrome which prevented her from working as a physical therapist.  *See* U.S. Trial Mem., Oct. 24, 2005, at 5.  Defense counsel could not have presented evidence of this without opening the door for evidence that the defendant had claimed disability insurance on this basis, and that in 1996, an insurance company had eventually determined that her claim of total disability was fraudulent.  *See id.*, Tr. Nov. 7, 2005 at 66.  All of this preceded the relevant time (1998-2002) of the defendant's charged bankruptcy fraud and failure to file taxes.  Defense counsel could not have legitimately simply "mentioned" a disability as a defense.  Moreover, the defense counsel specifically advised this Court, in the defendant's presence and without occasioning the defendant's objection, that she knew of "nothing which would give a basis for an insanity defense."  Tr. Nov. 7, 2005 at 2, 72. And later, again in the defendant's presence, defense counsel "strongly object[ed]" to the imposition of a mental health condition at sentencing.  *See* Tr. May 31, 2006 at 41.

//

//

9

### G. "Conviction obtained by violation of the right to be advised of plea agreements presented by the government"

The defendant claims that a plea agreement was offered to defense counsel, who failed to present and discuss it with her. *See* Def. § 2255 Mot., Ground Seven. It is ineffective assistance to fail to inform a client of a plea bargain, and to advise a client to enter a plea bargain when it is clearly in the client's best interest. *See United States v. Leonti*, 326 F.3d 1111, 1117 (9th Cir. 2003). However, the defendant does not state what the terms of this supposed plea agreement are, when this plea was offered, that the terms were more favorable than those to which she was ultimately sentenced, or that she would have accepted such a deal. Evidence from the record shows that the defendant was not willing to enter into a plea agreement. The defendant was present in court when the prosecutor explained to this Court prior to trial, "We have made an offer, and I think it's been clear that nothing is going to be reached. That's – I have gotten from the defense." Tr. Nov. 10, 2005 at 26. Neither the defendant nor defense counsel objected to this characterization, and clearly, the prosecutor's statement put the defendant on notice that an offer had been made. *See id.*

### H. "Defense counsel's failure to object to prejudicial testimony which was used to inflame minds of jury, constitutes ineffective assistance"

The defendant claims that defense counsel failed to make necessary objections during witness testimony. *See* Def. § 2255 Mot., Ground Eight. She gives no examples of what valid objections should have been, but were not, made. She provides no basis to believe that had such objections been made, she would not have been convicted. Government witnesses provided testimony that the defendant charged large amounts of money for her services. While this might have been prejudicial, it was not unfairly prejudicial, but merely showed that the defendant was guilty of the charged offenses. The trial record also shows that defense counsel were active in making objections.

//

//

1
2
3

**I. "Trial counsel's failure to object to irrelevant and unduly prejudicial statements which implied that petitioner was a dangerous and scandalous scam artist, an unsavory character merely to show that I am a bad person and thus more likely to have committed the crime, constituted ineffective assistance of counsel"**

4

5

6

7

8

9

10

11

12

The defendant claims that her trial counsel were ineffective in failing to object to this Court's and the prosecution's negative discussions of her religious practices before the jury. *See* Def. § 2255 Mot., Ground Nine. This also appears to be a claim that improper appeals to religious prejudice during the course of trial deprived the defendant of her Fifth Amendment right to a fair trial. *See United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir. 2000). There is no basis to the defendant's claims. As discussed previously, the trial record shows that neither this Court nor the prosecution made any negative remarks about the defendant's religion, and the defendant has provided no specific examples of what she means. *See supra* Argument Part II.A.

13

**J. "Conviction obtained by denial of effective assistance of counsel"**

14

15

16

17

18

19

20

21

22

23

24

The defendant claims that her trial counsel were ineffective because they "refused to provide expert and character witnesses during the trial" and "refused to seek relief under the Katrina disaster." *See* Def. § 2255 Mot., Ground Ten. The defendant does not explain what witnesses she believes should have been put on, and how the tactical decision not to present witnesses who could have perhaps been impeached, fell below a reasonable standard of professional assistance. In fact, the defense counsel explained her decision not to retain any experts. "[T]he only issues on which we believe expert testimony would be relevant are legal issues which are being addressed in the context of a legal instruction. . . . The only reason that we ever sought for an expert was the issue of the bankruptcy proceeding, and all of our issues are being dealt with in the context of a legal instruction[]." Tr. Nov. 10, 2005 at 3-4.

25

26

27

28

It is unclear what sort of relief based on her residence in New Orleans, which was devastated by Hurricane Katrina, the defendant believes was available in this criminal context. The district court granted the United States's motion in limine to exclude evidence of Hurricane Katrina at trial, which was irrelevant to the charges but might be

introduced to draw jury sympathy for the defendant.  *See* Tr. Nov. 7, 2005 at 66.  Defense counsel was therefore not permitted to make arguments at trial related to Hurricane Katrina, which post-dated any of the charged criminal activity.  Defense counsel did argue to this Court and the magistrate court prior to trial and at sentencing that the defendant be permitted to be supervised in a different district due to the impact Hurricane Katrina had on her residence and business in Louisiana, and that losses due to the disaster prevented her from paying full restitution and fine, as sought by the United States.  *See, e.g.,* Tr. May 31, 2006 (sentencing).  The defendant has not made a prima facie claim that her defense counsel performed ineffectively.

### K. "Conviction obtained by denial of effective assistance of counsel"

The defendant claims that her trial counsel were ineffective because they "failed to adequately acquaint [themselves] with bankruptcy and tax laws," and "failed to properly voir dire the jury."  *See* Def. § 2255 Mot., Ground Eleven.  There is no basis for the defendant's claim that defense counsel were insufficiently familiar with bankruptcy and tax laws.  Nor does the defendant explain how greater familiarity would have made a difference in her defense.  The relevant body of laws implicated in the charges were simple and straightforward and instructed to the jury by this Court.

The defendant's claim that defense counsel provided ineffective assistance of counsel by failing to properly voir dire the jury must also be dismissed.  The defendant fails to state how defense counsel was deficient in conducting the voir dire, *see Howard*, 381 F.3d at 879 (holding that conclusory assertions are insufficient to warrant relief or evidentiary hearing in Section 2255 motion), or how a different voir dire might have altered the outcome of her trial, *see Strickland*, 466 U.S. at 687 (explaining that petitioner must show how counsel's unprofessional errors prejudiced defendant in order to prevail in claim of ineffective assistance of counsel).

This claim also fails on the merits because the record shows that the voir dire was adequate.  An examination or voir dire of prospective jurors helps to ensure a defendant's Sixth Amendment right to be tried by an impartial jury.  *See United States v. Giese*, 597

1   F.2d 1170, 1181 (9th Cir. 1979).  The scope and procedure of the voir dire is entrusted to

2   the district court's sound discretion.  *See id.*  In this case, consistent with Fed. R. Crim.

3   24, the district court permitted the attorneys for the parties to participate in oral voir dire

4   of prospective jurors who had already submitted answers to written questionnaires, based

5   on a list of jointly submitted proposed questions.  *See* Tr. Nov. 7, 2005 at 72-76; Tr. Nov.

6   10, 2005 at 15-16; Tr. 9; CR 159.  The prosecutor asked each prospective juror questions

7   from the list, while the defense attorneys focused on listening to the answers and followed

8   up with questions to address concerns regarding particular prospective jurors.  Because of

9   this division of duties, the prosecutor spent much more time asking prospective jurors

10  questions, but this did not affect the adequacy of the voir dire.

11          A voir dire is adequate when "the questions are reasonably sufficient to test the

12  jury for bias or partiality."  *See United States v. Foster*, 57 F.3d 727, 730 (9th Cir. 1995).

13  In this case, the questions assuredly were sufficient to accomplish this task.  The

14  prospective jurors were asked whether they knew any of the parties, trial teams, or

15  witnesses.  *See* Tr. 6, 10-11.  Each prospective juror was asked if s/he knew any of the

16  parties, trial teams, or witnesses; was close to any law enforcement officers; had any bias

17  regarding law enforcement officers; had served in the military; been the victim or witness

18  of a crime or close to someone who had; been accused of a crime or close to someone

19  who had; had a bad experience with court, law enforcement, or the federal government;

20  had filed for bankruptcy or been close to someone who had; had been audited or any bad

21  experiences with tax agencies or been close to someone who had; understood and agreed

22  that a defendant was innocent until proven guilty and that it was the government's burden

23  to prove guilt beyond a reasonable doubt; could give the defendant the benefit of the

24  presumption of innocence if she exercised her constitutional right not to testify; could

25  follow the law as the court instructed; could think of anything about the nature of this

26  case that would make it difficult to be a juror.  *See, e.g.,* Tr. 6, 10-11, 15-19.

27          Defense counsel followed up with specific questions where answers to the

28  standard questions raised possible concerns.  *See* Tr. 19-21 (Prospective Juror Wong's

13

1  relative in law enforcement), 25-26 (Prospective Juror Le's lanague ability), 29-30

2  (Prospective Juror Benson's bias towards law enforcmeent), 41 (Prospective Juror

3  Mirto's mistrust of police and ability to follow instructions), 52-53 (Prospective Juror

4  Larkins's work schedule and views on tax), 59-61 (Prospective Juror Lee-Lum's work

5  experience with tax auditing and ability to follow instructions), 71-73 (Prospective Juror

6  Gargaikis-Prater's bias towards law enforcement), 84 (Prospecitve Juror Murphy's

7  disinclination to deliberate), 94-95 (Prospective Juror O'Malley's knowledge of then U.S.

8  Attorney and experience with criminal law), 115 (Prospective Juror Schneider's

9  experience with crimes), 132 (Prospective Juror Tolosa's respect for law enforcement),

10 137-38 (language ability), 141 (knowledge of tax and bankruptcy law, and ability to

11 accept legal instructions), 144-46 (burden of proof in criminal case), 148 (language

12 ability), 174 (ability to follow instructions), 175 (language ability), 206 (language ability),

13 224 (history of failing to file taxes).  These questions were all that this Court permitted.

14 *See* Tr. Nov. 7, 2005 at 74-75 (giving example of appropriate follow-up question).  Trial

15 counsel exercised all allotted challenges to jurors based on the voir dire.  *See* Tr. 85-88,

16 226-28, 230-35.  The resulting jury was the result of careful selection by defense counsel.

17 *See* Tr. 235, 237.  Defense counsel provided effective assistance at voir dire.

18   **L. "Counsel refused to object to erroneous evidence"**

19       The defendant states that defense counsel failed to advise this Court that

20 bankruptcy documents contained forged signatures.  *See* Def. § 2255 Mot., Ground

21 Twelve. The defendant does not specify which signatures on which documents she

22 believes were forged.  Presumably, she means that signatures appearing to be hers were

23 not in fact hers.  In any case, advising this Court of the defendant's position would not

24 have had any effect on the outcome of the trial; defense counsel would have had to

25 present evidence either through the defendant's testimony or a handwriting expert's

26 testimony that the signatures on the bankruptcy petitions were not in fact the defendant's.

27 The defendant has not provided any basis for this Court to believe that defense counsel

28 could have done this.

1

2

**M.  "Government witness was bribed by IRS and FBI"**

3

The defendant states that a government witness was granted the ability to file a

4

perjured document to the IRS and gain compensation.  *See* Def.§ 2255 Mot., Ground

5

Thirteen.  It is unclear exactly what this allegation means, or how it is a basis for a habeas

6

petition.  To the extent the defendant argues that her trial counsel provided ineffective

7

assistance by failing to impeach government witness de la Cruz by showing that he had

8

been bribed by the IRS and the FBI, the claim clearly must be dismissed.  The trial record

9

shows that defense counsel in fact did suggest during de la Cruz's cross-examination that

10

de la Cruz was motivated by his desire to obtain tax benefits.  *See* Tr 526-35, 551, 595;

11

*see generally, supra,* Argument Part II.E.  De la Cruz flatly denied that he had entered

12

into any agreement with the government in which the government would provide him

13

with benefits in exchange for his testimony.  *See* Tr. 569, 708.

14

**N.  "Counsel failed to object to testimony by the government witness negative to the defendant's character"**

15

The defendant alleges that defense counsel erred by failing to object to testimony

16

by a government witness that she harmed him from a distance, because this would permit

17

the jury to infer that she was a demonic and dangerous person who, regardless of guilt,

18

should be locked up.  *See* Def.§ 2255 Mot., Ground Fourteen.  First, the defendant fails to

19

specify what testimony she believes is objectionable.  Second, the jury was instructed that

20

the defendant was not on trial for any conduct or offense not charged in the indictment,

21

*see* Tr. 715, 728, not to consider punishment in its deliberations, *see* Tr. 778, to follow the

22

law as instructed, *see* Tr. 711, and to decide the case soley on the evidence and not based

23

on "any personal likes or dislikes, opinions, prejudices or sympathy," *see id.*  The jury

24

must be presumed to have followed these instructions.  *See Weeks v. Angelone*, 528 U.S.

25

225, 234 (2000).

26

//

27

//

28

//

1
2

**O. "Conviction obtained by failure to notify accused of Grand Jury commencement or outcome"**

3      The defendant claims that her rights were violated because she was never notified

4  of a grand jury trial. *See* Def.§ 2255 Mot., Ground Fifteen.  The defendant misapprehends

5  the nature of a grand jury proceeding.  A defendant has no right to be notified of a grand

6  jury proceeding, or to participate in such a proceeding.  Grand jury proceedings are in fact

7  secret.  *See United States v. Navarro-Vargas*, 408 F.3d 1184, 1199-1202 (9th Cir. 2005).

8  The defendant was notified of the outcome of grand jury proceedings when she was

9  arraigned on an indictment and subsequent superseding indictments.  *See* CR 3, 84.

10

11     **P. "Counsel did not object to situations that encouraged the jury to believe that the defendant was a notorious criminal"**

12     The defendant claims that defense counsel failed to object to situations that

13 encouraged the jury to believe that she was a notorious criminal, which presumably she

14 believes constituted ineffective assistance.  *See* Def.§ 2255 Mot., Ground Sixteen.  The

15 defendant baldly asserts that the prosecutor seated at least ten FBI and IRS agents around

16 counsel table and filled the first two benches near the table with additional law

17 enforcement agents.  The record does not support the defendant's allegation.

18     The United States requested permission to have two case agents at counsel's table,

19 under Fed. R. Evid. 615(2).  *See* CR 150.  The reason for the two case agents was that one

20 was from the FBI and investigated the bankruptcy fraud charges, while the other was

21 from the FBI and had responsibility for the tax charges.  *See id.*  Only the IRS case agent

22 testified briefly as to her role in the investigation.  *See* Tr. 351, 626.  The United States

23 also requested permission for a summary witness from the IRS to remain in the courtroom

24 during proceedings so that he could help to provide calculations based on numbers

25 provided by other witnesses in their testimony.  *See* Tr. Nov. 7, 2005 at 62-63; Tr. 668-69.

26 The United States's requests were supported by well-established Ninth Circuit law,

27 finding that case agents may sit at counsel table.  *See United States v. Charles*, 456 F.3d

28 249, 257-58 (9th Cir. 2006).  The purpose of sequestering witnesses is "to discourage and

16

1  expose fabrication, inaccuracy, and collusion." *Id.* at 258. These concerns are not

2  implicated with non-testifying agents and summary witnesses. This Court granted the

3  United States's requests over defense counsel's objection and the enumerated persons

4  were permitted to remain at counsel table and in court. *See* Tr. Nov. 7, 2005 at 62; Tr. 7.

5  Having presided over the trial, this Court may take judicial notice that there were not at

6  least ten FBI and IRS agents around the prosecution table.

> **Q. "Where counsel passes over clearly inadmissible evidence, which is prejudicial to defendant has no strategic value and constitutes ineffective assistance of counsel"**

9  The defendant claims that defense counsel erred by permitting the United States to

10  admit evidence of a check showing that her bankruptcy attorney was aware of the

11  defendant's accounts.. *See* Def.§ 2255 Mot., Ground Seventeen. Evidence that the

12  defendant paid her bankruptcy attorney from an account that was not declared an asset on

13  her bankruptcy petition was admissible to show that she possessed and knew that she

14  possessed this concealed asset. Defense counsel argued that this fact showed that the

15  bankruptcy attorney knew about the undeclared asset and that it was therefore he, and not

16  the defendant, who was to blame for not revealing it in the bankruptcy proceedings. *See*

17  Tr. 758. The defendant does not state a prima facie claim of ineffective assistance of

18  counsel.

> **R. "Joinder of cases detrimental to defendant's case"**

20  The defendant was charged with and convicted of four counts of concealing assets

21  in connection with a bankruptcy proceeding, in violation of 18 U.S.C. § 152(1) and six

22  counts of failing to file tax returns for each year from 1998 to 2003 in violation of 26

23  U.S.C.§ 7203. *See* CR 27; 199. The defendant alleges that her defense counsel refused

24  her request to try and sever the tax charges from the bankruptcy fraud charges, and that

25  the improper joinder of the two sets of charges entitles her to habeas relief. *See* Def. §

26  2255 motion, Ground Eighteen. She is wrong on both grounds.

27  Well before trial, defense counsel filed motions to sever the bankruptcy fraud from

28  the tax charges. CR 31, 52, 65, 80; *see* Tr. Apr. 25, 2005 at 3. The United States opposed

1  this, arguing that joinder was proper under Fed. R. Crim. P. 8(a) and 14 because the

2  offenses were logically related and involved overlapping proof.  *See* CR 34, 54, 73; *see*

3  Tr. Apr. 25, 2005 at 4-5.  This Court partially granted the defendant's motion and severed

4  one of the tax charges based on lack of venue, but left the remaining nine counts joined.

5  *See* CR 83, 236.  At the close of evidence, the defendant renewed her motion for

6  severance, which the district court denied.  *See* CR 196.

7       The defendant failed to raise the joinder issue on direct appeal and has not

8  demonstrated cause and prejudice, or her actual innocence.  *See* Brief of Appellant.

9  Therefore, she has procedurally defaulted her right to raise it in her motion under 28

10  U.S.C. § 2255.  *See Bousley v. United States*, 523 U.S. 614, 621 (1998) (emphasizing that

11  habeas review is extraordinary remedy and not substitute for direct appeal); *United States*

12  *v. Braswell*, 501 F.3d 1147, 1149-50 (9th Cir. 2007) (same).

13       Even if the defendant had not defaulted on her right to raise the joinder issue, her

14  claim fails on the merits.  The defendant fails to provide any grounds for her contention

15  that the district court's decision to partially deny the defendant's motion to sever the

16  charges violated her rights under federal and Constitutional law.  Joinder of the remaining

17  nine bankruptcy fraud and tax charges was appropriate.  Fed. R. Crim. P. 8(a) states that

18      [t]he indictment . . . may charge a defendant in separate counts with
        2 or more offenses if the offenses charged– whether felonies or

19      misdemeanors or both–are of the same or similar character, or are
        based on the same act or transaction, or are connected with or

20      constitute parts of a common scheme or plan.

21  *See also United States v. Jawara*, 474 F.3d 565, 575-79 (9th Cir. 2007) (discussing

22  whether offenses were of same or similar character)*; United States v. Anderson*, 642 F.2d

23  281, 284 (9th Cir. 1981) ("When the joined counts are logically related, and there is a

24  large area of overlapping proof, joinder is appropriate.").  The bankruptcy and tax charges

25  against the defendant were similar in character, all being part of a common scheme to

26  conceal assets from the government, and to prevent creditors, including the Internal

27  Revenue Service, from receiving their lawful due.  They also involved a large overlap in

28  proof.  The defendant filed for bankruptcy on December 30, 1998.  In filling out the

1   bankruptcy schedules and statement of financial affairs, the defendant failed to disclose

2   assets, including payments by several persons for the defendant's therapeutic services.

3   The defendant also failed to file a tax return on these incomes.  The largest sources of

4   these incomes were two witnesses who continued to pay large amounts for the

5   defendant's services through 2003 and 2000, respectively.  Between 1998 and 2003,

6   Michael De la Cruz paid the defendant approximately $1.7 million dollars.  Between 1998

7   and 2000, Martha Sperry paid the defendant approximately $60,000 dollars.  The

8   defendant failed to file tax returns for any income that she received between 1998 and

9   2003.

10        In any case, misjoinder under Fed. R. Crim. P. 8(a) "requires reversal only if the

11  misjoinder results in actual prejudice because it 'had substantial and injurious effect or

12  influence in determining the jury's verdict.'" *United States v. Terry*, 911 F.2d 272, 277

13  (9th Cir. 1990) (internal citation omitted).  In *Terry*, the Ninth Circuit found the

14  misjoinder of gun and drug charges to require reversal because jurors would likely to be

15  more concerned about a drug dealer toting a gun around than they would be about a

16  person with a prior criminal conviction possessing a firearm.  *See id.* at 276.  No similar

17  prejudicial effect resulted from the joinder of the defendant's bankruptcy fraud and

18  failure to file tax charges.  The nature of both types of charges are the same.  Nothing of

19  the defendant's failure to file tax returns would be likely to suggest the defendant was

20  more dangerous or criminal than her fraudulent activity in filing for bankruptcy, and vice

21  versa.

22        The merits of any claim the defendant may be maing that the district court violated

23  Fed. R. Crim. P. 14 are even weaker than her claim regarding Rule 8(a).  Rule 14 gives

24  the district court the discretion to sever counts where the district court finds that joinder

25  would unduly prejudice the defendant.  A district court only abuses its discretion if

26  joinder resulted in "clear, manifest, or undue prejudice" – a more stringent standard than

27  that of Rule 8(a).  *See United States v. VonWillie*, 59 F.3d 922, 930 (9th Cir. 1995).  The

28  Ninth Circuit has found that that no such prejudice resulted from a district court's refusal

1   to sever a count charging felon-in-possession of a firearm from a count charging use of a

2   firearm in relation to a drug trafficking crime. *See id.; compare Terry*, 911 F.2d at 277

3   (finding substantial prejudice under Rule 8(a) in joinder of gun and drug charges).

4   Certainly, no manifest prejudice existed in this case from the joinder of bankruptcy fraud

5   and tax charges, proof of which was overwhelming. *See* Tr. 732-54.

6                                    **CONCLUSION**

7           For the foregoing reasons, the United States respectfully asks this Court to deny

8   the defendant's motion, and believes that it may do so without an evidentiary hearing.

9

10  Dated: June 4, 2008                    JOSEPH P. RUSSONIELLO
                                           United States Attorney
11
                                                /s/
12
                                           _____
13                                         MERRY JEAN CHAN
                                           Assistant United States Attorney
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            20

PAGES 1 - 19

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

**CERTIFIED COPY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. CR-04-40016 CW |
| | ) | |
| VS. | ) | MONDAY, AUGUST 15, 2005 |
| | ) | |
| SHARON LEE CAULDER, | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**FOR PLAINTIFF:**          KEVIN R. RYAN,
                            UNITED STATES ATTORNEY
                            1301 CLAY STREEET
                            OAKLAND, CALIFORNIA  94612
                  BY:  **MERRY JEAN CHAN,**
                       **ASSISTANT UNITED STATES ATTORNEY**

**FOR DEFENDANT:**          BARRY PORTMAN,
                            FEDERAL PUBLIC DEFENDER
                            555 12TH STREET, SUITE 650
                            OAKLAND, CALIFORNIA 94607
                  BY:  **REBECCA SILBERT,**
                       **DANIEL BLANK,**
                       **ASSISTANT FEDERAL PUBLIC DEFENDERS**

**REPORTED BY:**            **DIANE E. SKILLMAN, CSR 4909, RPR, FCRR**
                            **OFFICIAL COURT REPORTER**

MONDAY, AUGUST 15, 2005                                    2:30 P.M.

**THE CLERK:**  CALLING THE MATTER OF UNITED STATES

VERSUS SHARON CAULDER.  CRIMINAL ACTION NUMBER CR-04-40016.

COUNSEL, PLEASE COME FORWARD AND STATE YOUR

APPEARANCES FOR THE RECORD.

**THE COURT:**  GO AHEAD.

**MS. CHAN:**  MERRY JEAN CHAN ON BEHALF OF THE UNITED

STATES.  GOOD AFTERNOON, YOUR HONOR.

**MS. SILBERT:**  GOOD AFTERNOON, REBECCA SILBERT.

PRESENT IS SHARON CAULDER.  ALSO DAN BLANK FROM THE SAN

FRANCISCO FEDERAL PUBLIC DEFENDERS OFFICE WHO WILL BE MY

CO-COUNSEL THROUGH TRIAL.

**MR. BLANK:**  GOOD AFTERNOON YOUR HONOR.

**THE COURT:**  GOOD AFTERNOON.

OKAY.  SO WE HAVE VARIOUS MOTIONS FROM THE

DEFENDANT, AND MY THOUGHTS ON THEM ARE AS FOLLOWS:

YOU KNOW, I WAS UNCOMFORTABLE SIGNING THESE

SUBPOENAS WITHOUT SOME INPUT FROM THIS VICTIM WHO OBVIOUSLY HAS

SOME RIGHTS IN THE MATTER AS WELL AS HIS PSYCHIATRIST.  WHETHER

THE GOVERNMENT HAS STANDING OR NOT, I APPRECIATE HAVING SOMEONE

PRESENT THE OPPOSING VIEW OR THE VIEW THAT PERHAPS THE WITNESS

MIGHT WANT PRESENTED, AND I DON'T THINK IT'S NECESSARILY

APPROPRIATE THAT A WITNESS SHOULD BE REQUIRED TO GO TO THE

EXPENSE OF RETAINING COUNSEL IN ORDER TO HAVE HIS POSITION

1    PRESENTED WHEN HE IS PRESUMABLY BEING SUBPOENAED BY THE

2    GOVERNMENT.

3            SO, WHETHER THE GOVERNMENT HAS STANDING OR NOT, I AM

4    GOING TO CONSIDER THE LAW THAT THE GOVERNMENT HAS PRESENTED.

5    THERE IS A PRIVILEGE; HOWEVER, IT SEEMS THAT THE PRIVILEGE

6    COULDN'T POSSIBLY SURMOUNT AN ACTUAL POSSIBILITY THAT A

7    GOVERNMENT WITNESS MIGHT BE INCOMPETENT TO TESTIFY.

8            SO, I DO THINK I HAVE TO DETERMINE WHETHER THIS

9    WITNESS IS COMPETENT TO TESTIFY.  AND I GUESS THE POSSIBILITIES

10   WOULD BE THAT I COULD ALLOW THE SUBPOENA OF HIS PSYCHIATRIC

11   RECORDS AND REVIEW THEM IN CAMERA TO SEE IF THERE IS ANY

12   INDICATION OF DELUSIONAL THINKING OR ANYTHING OF THAT NATURE.

13           I COULD, I SUPPOSE, APPOINT A COURT-APPOINTED EXPERT

14   TO REVIEW THE RECORDS, AND WHICHEVER ONE I DID, I GUESS --

15   WHICHEVER ONE I DID, I COULD THEN HOLD A COMPETENCY HEARING

16   BEFORE HE TESTIFIES, PERHAPS ON THE MORNING HE TESTIFIES, OR

17   THE AFTERNOON BEFORE TO SEE IF HE IS COMPETENT.

18           I AM NOT INCLINED TO ORDER A PSYCHIATRIC EXAM UNLESS

19   I WERE TO REVIEW THE RECORDS AND FIND THAT THERE REALLY WAS

20   SOME MANNER FOR CONCERN.

21           AS FAR AS THE TAX RETURNS GO, AGAIN, I GUESS I COULD

22   REVIEW HIS TAX RETURNS IN CAMERA AND THE DEFENSE COULD POINT

23   OUT ANY PORTION OF THE TAX RETURNS THAT YOU THINK NEED TO BE

24   LOOKED AT TO DETERMINE SOME INCONSISTENCY WITH THE VICTIM'S

25   TESTIMONY.

1        THE DEFENSE POINTS OUT THAT YOU PUT IN A DECLARATION

2  THAT THERE AREN'T ANY GIFT RETURNS FILED IN THE FRESNO OFFICE,

3  WHICH I SUPPOSE LEAVES OPEN THE POSSIBILITY THAT GIFT RETURNS

4  WERE FILED IN SOME OTHER OFFICE UNLESS YOU COULD SUBMIT A

5  DECLARATION CLARIFYING THAT IF THERE WERE ANY, THEY WOULD BE IN

6  THE FRESNO OFFICE OR THE FRESNO OFFICE SEARCHED EVERYWHERE

7  ELSE, BUT THE DEFENSE ALSO POINTS OUT OTHER POSSIBLE PLACES

8  THAT SUCH THINGS CAN TURN UP BESIDES THE GIFT RETURN -- I'VE

9  FORGOTTEN WHERE SHE SAID THEY MIGHT BE.

10        SO, WHAT WERE YOU SAYING -- WHERE ELSE DID YOU SAY I

11  SHOULD LOOK BESIDES THE GIFT RETURN?

12        **MS. SILBERT:**  I AM SORRY, YOUR HONOR.  I WAS JUST

13  HAND HANDED A DECLARATION FROM MS. CHAN.  JUST A MOMENT.

14        WHAT I HAD POINTED OUT, YOUR HONOR, WAS, FIRST OF

15  ALL, THE FRESNO OFFICE, AS YOUR HONOR --

16        **THE COURT:**  RIGHT.  WE TALKED ABOUT THAT.  I'M

17  ASKING YOU A DIFFERENT QUESTION NOW.

18        **MS. SILBERT:**  THE SECOND POINT I MADE WAS THAT

19  THERE'S THE FORM 709, WHICH IS THE GIFT TAX RETURN, BUT I THINK

20  THERE ARE OTHER WAYS --

21        **THE COURT:**  WHAT ARE THOSE WAYS?  IF I AM GOING TO

22  ASK HER TO TURN OVER CERTAIN PORTIONS, I DON'T WANT TO LOOK AT

23  ALL THE TAX RETURNS.  YOU TELL ME WHAT PORTIONS YOU THINK I

24  NEED TO LOOK AT WHERE I MIGHT FIND SOMETHING THAT YOU WOULD

25  FIND RELEVANT.

1    **MS. SILBERT:**  THERE IS SOMETHING CALLED THE UNIFIED

2    CREDIT, WHICH IS APPARENTLY A WAY TO ACCOUNT FOR TAX RETURNS.

3         AND WHAT I HAD PROPOSED IN MY BRIEFING WAS THAT THE

4    DOCUMENTS BE PRODUCED, AND THEY COULD BE UNDER A PROTECTIVE

5    ORDER UNDER SEAL, TO AN EXPERT -- A DEFENSE AND GOVERNMENT

6    EXPERT, SO THEY CAN LOOK AT THEM AND ASSIST THE COURT IN

7    DETERMINING WHAT'S RELEVANT BECAUSE I DON'T EXPECT THAT ANY OF

8    US IN THIS ROOM HAVE THE TAX BACKGROUND NECESSARY TO BE ABLE TO

9    KNOW IMMEDIATELY WHAT IS THE ACTUAL MEANING OF THE CONTENT OF

10   THOSE RECORDS.  SO THEY COULD BE RECEIVED BY THE COURT IN

11   CAMERA AND GIVEN UNDER SEAL TO A DEFENSE AND GOVERNMENT EXPERT

12   TO OPINE FOR THE COURT AS TO WHAT'S IN THERE --

13        **THE COURT:**  I DON'T WANT TO GO THAT FAR.  IF YOU

14   WANT TO SUBMIT A DECLARATION FROM AN ACCOUNTANT THAT WOULD

15   IDENTIFY WHICH PORTIONS OF THE TAX RETURN YOU THINK MIGHT

16   CONTAIN SOME RELEVANT OR IMPEACHMENT-TYPE INFORMATION AND WHAT

17   IT WOULD SAY, AND WHAT I SHOULD LOOK FOR, YOU CAN SUBMIT THAT

18   AND I WILL LOOK AT THEM WITH THAT IN MIND.  OR I'LL LOOK ONLY

19   AT THE PARTS, I GUESS I SHOULD SAY, THAT YOU IDENTIFY.

20        **MS. CHAN:**  YOUR HONOR, JUST TO THE TAX RETURN

21   PORTION OF WHAT THE COURT IS INCLINED TO DO, I HAVE SPOKEN WITH

22   INDIVIDUALS FROM THE IRS, AND I WILL BE HAPPY TO GET A

23   DECLARATION TO THE EXTENT, THAT SPEAKS TO THE EXTENT TO WHICH

24   THE 709'S THAT WERE THE CERTIFICATE OF THE FORM 709'S WERE

25   PROVIDED FROM WHICH THEY CAME FROM.

PAGES 1 - 81

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **CERTIFIED COPY** |
| | ) | |
| PLAINTIFF, | ) | NO. CR-04-40016 CW |
| | ) | |
| VS. | ) | MONDAY, NOVEMBER 7, 2005 |
| | ) | |
| SHARON LEE CAULDER, | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANT. | ) | |
| _____ | ) | |

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

**APPEARANCES:**

**FOR PLAINTIFF:**           KEVIN R. RYAN,
                             UNITED STATES ATTORNEY
                             1301 CLAY STREEET
                             OAKLAND, CALIFORNIA   94612
                    BY:   **MERRY JEAN CHAN,**
                          **LEWIS A. DAVIS,**
                          **ASSISTANT UNITED STATES ATTORNEYS**


**FOR DEFENDANT:**           BARRY PORTMAN,
                             FEDERAL PUBLIC DEFENDER
                             555 12TH STREET, SUITE 650
                             OAKLAND, CALIFORNIA 94607
                    BY:   **REBECCA SILBERT,**
                          **DANIEL BLANK,**
                          **ASSISTANT FEDERAL PUBLIC DEFENDERS**


**REPORTED BY:**             **DIANE E. SKILLMAN, CSR 4909, RPR, FCRR**
                             **OFFICIAL COURT REPORTER**

```
 1   MONDAY, NOVEMBER 7, 2005                              2:30 P.M.

 2

 3            THE CLERK:  CALLING THE MATTER OF UNITED STATES

 4   VERSUS SHARON LEE CAULDER.   CRIMINAL ACTION NUMBER CR-04-40016.

 5            COUNSEL, PLEASE COME FORWARD AND STATE YOUR NAME FOR

 6   THE RECORD.

 7            MS. CHAN:  GOOD AFTERNOON, YOUR HONOR, MERRY JEAN

 8   CHAN ON BEHALF THE UNITED STATES WITH LEW DAVIS PRESENT.

 9            MR. DAVIS:  GOOD AFTERNOON, YOUR HONOR.

10            MS. SILBERT:  GOOD AFTERNOON, YOUR HONOR, REBECCA

11   SILBERT WITH SHARON CAULDER, WHO IS PRESENT.

12            MR. BLANK:  DANIEL BLANK, YOUR HONOR, ALSO ON BEHALF

13   OF MS. CAULDER.

14            THE COURT:  GOOD AFTERNOON.

15            THIS IS ON FOR A PRETRIAL CONFERENCE.  WE HAVE A

16   NUMBER OF ISSUES.  I GUESS WHY DON'T WE START WITH

17   STIPULATIONS.

18            IT SEEMS A LOT OF EVIDENCE THAT THE GOVERNMENT WANTS

19   TO PUT ON EITHER COULD BE OR HAS BEEN STIPULATED TO BY THE

20   DEFENDANT, SO I THINK WE CAN SHORTEN THE TRIAL CONSIDERABLY BY

21   DEALING WITH SOME OF THOSE STIPULATIONS.

22            ARE THERE SOME THAT YOU ARE UNWILLING TO ACCEPT FOR

23   SOME REASON?

24            MS. CHAN:  YOUR HONOR, WE ACTUALLY HAVEN'T ARRIVED

25   AT ANY STIPULATIONS.  WE HAVE BEEN DISCUSSING THE POSSIBILITY
```

1    INCOME OR LACK OF INCOME, OR BUSINESS DEALINGS IN 2003, WHICH

2    HAVE NOTHING TO DO WITH THE PRIOR YEARS.  IT CAN'T POSSIBLY BE

3    EVIDENCE OF WHAT OCCURRED PRIOR TO THAT.

4            MR. DAVIS:  AS A MATTER OF FACT, YOUR HONOR, THE

5    NINTH CIRCUIT IS CLEAR THAT 404(B) EVIDENCE CAN BE EVIDENCE

6    THAT OCCURS AFTER CHARGED OCCURRENCES.  I WILL BE HAPPY TO

7    INCLUDE THAT INFORMATION ALONG WITH MY RESEARCH ABOUT THE

8    UNDISCLOSED DEFENSE EXPERTS AT THE SAME TIME.

9            MS. CHAN:  YOUR HONOR, ALSO THE 2003, THERE IS SOME

10   PAPERS, FOR EXAMPLE, THAT DO REFLECT INFORMATION THAT WE

11   BELIEVE WOULD BE RELEVANT TO THE CONDUCT BETWEEN 1998 AND 2002.

12           FOR EXAMPLE, ON A LOAN APPLICATION THAT WAS FILED IN

13   THE MIDDLE OF 2003, THE DEFENDANT LISTS HER MONTHLY INCOME AS

14   WELL AS HER NET ASSETS.  THOSE NET ASSETS, FOR EXAMPLE,

15   REPRESENT -- REFLECT WHAT SHE WAS EARNING THE YEARS BEFOREHAND

16   BECAUSE SHE DIDN'T OBTAIN ALL 1.2 MILLION OF HER NET ASSETS IN

17   THAT YEAR.

18           THE COURT:  OKAY.  I WILL ALLOW THE '03 FAILURE TO

19   FILE.

20           NUMBER SEVEN, PRECLUDE RELIGIOUS BELIEFS.  GRANTED.

21           NUMBER EIGHT PRECLUDE AMOUNT IN BANK ACCOUNTS ON

22   DATE OF DISCHARGE IS DENIED.

23           MOTION TO UNSEAL PSYCHIATRIC RECORDS.  I HAVE

24   REVIEWED THOSE PSYCHIATRIC RECORDS IN CAMERA AND FOUND NOTHING

25   THAT NEEDED TO BE DISCLOSED EITHER FOR COMPETENCE OR FOR

1    **MR. DAVIS:**  SHALL WE JUST BE PREPARED, YOUR HONOR TO

2  HAVE OPENING STATEMENTS AND THE FIRST WITNESS JUST IN CASE?

3          **THE COURT:**  YES.  YES.

4          **MS. CHAN:**  OKAY.

5          **MR. DAVIS:**  THAT'S FINE.  THANK YOU.

6          **THE COURT:**  I WILL ALLOW THE TWO CASE AGENTS TO SIT

7  IN.

8          AND I DON'T REALLY SEE A PROBLEM WITH HAVING TONNA

9  SIT IN TO MAKE -- I DON'T KNOW IF THIS IS EVEN GOING TO BE

10  NECESSARY, BUT IS HE GOING TO BE MAKING CALCULATIONS AS

11  WITNESSES TESTIFY?

12          **MS. CHAN:**  YES.

13          **MS. SILBERT:**  IT IS ALL STIPULATED FACTS.  THERE IS

14  NO FACT --

15          **MS. CHAN:**  NOT FOR THE SEVERAL PEOPLE WHO WON'T BE.

16          FOR EXAMPLE, I DON'T ACTUALLY KNOW, BUT MR. DE LA

17  CRUZ, FOR EXAMPLE, IS GOING TO BE TESTIFYING.  AND IT MAY BE --

18  ACTUALLY THIS GOES BACK TO THE QUESTION OF WHETHER HE WOULD BE

19  ADMISSIBLE AS AN EXPERT WITNESS IN TERMS OF LISTENING TO THE

20  TESTIMONY, BEING ABLE TO DETERMINE WHETHER THAT -- BASED UPON

21  HIS EXPERT KNOWLEDGE, WHETHER -- WHAT MR. DE LA CRUZ PAID IN

22  HIS EXPERT OPINION IS TAXABLE INCOME.

23          **THE COURT:**  NO.

24          **MS. CHAN:**  OKAY.

25          **MR. DAVIS:**  BUT HE IS GOING TO BE TAKING NOTES ABOUT

1    THE AMOUNT OF INCOME THAT THE DEFENDANT WAS PAID, AND HE WILL

2    DO THAT WITH EACH WITNESS.

3            DEFENSE SAYS THIS IS ALL STIPULATED TO.  THAT IS

4    ACTUALLY NOT CORRECT.  EVEN WITH THE COURT'S ORDER, THERE WOULD

5    BE AT LEAST FOUR WITNESSES FOR WHOM IT IS NOT STIPULATED.  WE

6    THINK IT'S IMPORTANT FOR HIM TO DO THAT, AND THERE IS NO

7    PREJUDICE THAT OCCURS TO ANYBODY AS A RESULT OF THIS BECAUSE

8    HIS TESTIMONY HAS BEEN CIRCUMSCRIBED, WE KNOW WHAT HE IS GOING

9    TO BE TALKING ABOUT, AND HE'S ONLY HERE TO HEAR WHAT IT IS THEY

10   ARE SAYING TO THE EXTENT OF WHICH IT EFFECTS HIS CALCULATIONS.

11           SO, WE DON'T REALLY SEE ANY REASON WHY HE SHOULD NOT

12   BE PERMITTED.

13           **THE COURT:**  YEAH, I THINK HE SHOULD BE.  IT IS GOING

14   TO BE A WASTE OF TIME IF HE ISN'T.

15           YOU SHOULD TELL ALL YOUR WITNESSES NOT TO DISCUSS

16   THEIR TESTIMONY AND NOT TO READ ANY TRIAL TRANSCRIPTS, IF THERE

17   ARE ANY.

18           ON THE GOVERNMENT'S MOTIONS IN LIMINE --

19           **MS. CHAN:**  SORRY, YOUR HONOR.  CAN WE JUST RETURN TO

20   THE -- I KNOW THE MOTION TO PRECLUDE THE GOVERNMENT FROM

21   INQUIRING INTO MS. CAULDER'S RELIGIOUS BELIEFS HAS BEEN

22   GRANTED, I JUST WANTED TO CLARIFY THE SCOPE OF THAT.

23           SOME OF WHAT MS. CAULDER DOES IS A SPIRITUAL HEALING

24   AND ENERGY HEALING, I BELIEVE INVOLVES HER, PERHAPS HER

25   RELIGIOUS BELIEFS, AND IF I COULD GET SOME CLARIFICATION ABOUT

1    THE SCOPE INTO WHICH WE MAY INQUIRE.

2            FOR EXAMPLE, THE BOOK THAT SHE WROTE THAT SHE

3    RECEIVED ROYALTIES IS CALLED "THE MARK OF VOODOO", WHICH I

4    BELIEVE IS -- I BELIEVE THAT VODUN IS THE RELIGION THAT

5    MS. CAULDER IS REFERRING TO IN TERMS OF HER RELIGIOUS BELIEFS.

6            WOULD WE BE PERMITTED TO, FOR EXAMPLE, TO INTRODUCE

7    THE TITLE OF THE BOOK OR TO ASK --

8            **THE COURT:**  I DON'T SEE ANY NEED FOR IT.

9            **MS. CHAN:**  OKAY.

10           **THE COURT:**  JUST SAY, YOU WROTE A BOOK?  YES.

11           ROYALTIES?  YES.

12           **MR. DAVIS:**  YOUR HONOR, PERHAPS, IF WE MIGHT, JUST

13   GET PERMISSION OF THE COURT TO APPROACH THE COURT ON A

14   SIDEBAR BASIS IN THE EVENT --

15           **THE COURT:**  NO.  I DON'T DO SIDEBARS.  YOU CAN ASK

16   IN THE MORNING, AT A BREAK, AT THE END OF THE DAY.

17           **MS. CHAN:**  WOULD WE BE ABLE TO ASK, FOR EXAMPLE, WE

18   BELIEVE THAT SHE HAS USED FOR EXAMPLE THAT IT'S ALL

19   INTERRELATED; THAT SHE USED THE BOOK TO PROMOTE HER ENERGY

20   HEALING PRACTICE.  SO, FOR EXAMPLE, WOULD WE BE ABLE TO ASK THE

21   QUESTION, ALONG THE LINES OF:  DID YOU WRITE A BOOK ABOUT, YOU

22   KNOW, YOUR DEVELOPMENT OF YOUR SKILLS AS AN ENERGY HEALER?

23           IN SOME WAYS TO SORT OF GET AT THAT BECAUSE PART OF

24   HOW WE WANT TO SHOW THAT SHE IS A BUSINESS IS THAT SHE PROMOTED

25   HERSELF VIGOROUSLY THROUGH VARIOUS VENUES, THROUGH

1  ADVERTISEMENTS, THROUGH WRITING A BOOK, THROUGH APPEARING ON TV

2  AND RADIO SPOTS.

3           **THE COURT:**  I GUESS YOU CAN ASK IF SHE WROTE A BOOK

4  THAT RELATES IN SOME WAY TO HER PRACTICE.

5           **MS. CHAN:**  THANK YOU, YOUR HONOR.

6           **THE COURT:**  THE NAME OF THE BOOK AND NAME OF THE

7  RELIGION, AND WHATEVER ELSE MAY WELL COME OUT.  IT'S NOT GOING

8  TO BE LIKE THERE'S A MISTRIAL IF THE WORDS GET SPOKEN.  I JUST

9  DON'T WANT IT TO BE OVEREMPHASIZED.

10          **MS. CHAN:**  THERE WON'T BE UNDUE EMPHASIS ON IT.

11          **THE COURT:**  SO, DEFENDANT SAYS SHE IS NOT ASSERTING

12  AN ADVICE OF COUNSEL DEFENSE.  IF YOU DO, OF COURSE, IT WOULD

13  WAIVE THE PRIVILEGE.

14          I AM NOT GOING TO LIMIT THE TESTIMONY OF THE PATIENT

15  WITNESSES TO THE -- I DON'T KNOW WHAT YOU WERE ASKING FOR, BUT

16  WHATEVER IT IS, IT'S DENIED.  IT IS NOT GOING TO BE LIMITED

17  UNDULY TO ONLY --

18          **MS. CHAN:**  MAY I ACTUALLY CLARIFY?

19          **THE COURT:**  I JUST DON'T REMEMBER WHAT IT IS, BUT

20  IT'S DENIED WHATEVER IT WAS.

21          **MS. CHAN:**  OKAY.  IT WAS JUST AN ISSUE OF, YOU KNOW,

22  FOR EXAMPLE, IF THE DEFENDANT WAS PRIVY TO SPECIFIC -- WE

23  BELIEVE THAT SOME OF HER PATIENTS, FOR EXAMPLE, WERE VICTIMS OF

24  ABUSE AS CHILDREN AND RITUAL ABUSE --

25          **THE COURT:**  THEY ARE NOT GOING TO ASK THINGS LIKE

1    THAT.

2            **MS. CHAN:**  OKAY.  THAT'S -- THEN THAT'S FINE.  THAT

3    IS WHAT WE WERE CONCERNED ABOUT.

4            **THE COURT:**  EXCLUDE REFERENCE TO GOVERNMENT

5    PROSECUTION WILL BE GRANTED.

6            EXCLUDE EVIDENCE ABOUT EXEMPTION STATUS IS DENIED.

7            EXCLUDE EVIDENCE OF HURRICANE KATRINA IS GRANTED.

8            THEY CAN SAY THAT THEY ARE PUBLIC DEFENDERS.

9            I SUPPOSE THE ONLY WAY THIS RITUAL ABUSE BUSINESS

10   WOULD COME IN WOULD BE IF THE WHOLE THING ABOUT THE DISABILITY

11   WAS OPENED UP FOR SOME REASON, WHICH I AM NOT ANTICIPATING THAT

12   IT WILL BE, SO --

13           **MS. CHAN:**  OUR -- OUR --

14           **THE COURT:**  THE ONLY WAY RITUAL ABUSE WOULD COME IN

15   WOULD BE IF YOU OPEN THE DOOR TO IT IN SOME WAY.

16           YES, REFERENCES TO SPECIFIC PUNISHMENT WON'T BE

17   MADE, BUT GENERAL REFERENCES TO IMPORTANCE OF CHARGES AND

18   SERIOUSNESS, AND THIS AND THAT WILL BE ALLOWED.

19           AND THE DEFENDANT AT ITS PERIL SHALL COMPLY WITH

20   WHATEVER REQUIREMENTS THERE ARE ABOUT RECIPROCAL DISCOVERY.

21           OKAY.

22           **MS. CHAN:**  SORRY, YOUR HONOR.

23           **THE COURT:**  YES.

24           **MS. CHAN:**  WITH RESPECT TO THE EXEMPTION STATUS OF

25   ASSETS, THAT'S WITH RESPECT TO THE ARGUMENT SO THEY WILL BE

1    PERMITTED TO ARGUE, MAKE THE ARGUMENT THE FACT THAT ASSETS

2    MIGHT HAVE BEEN EXEMPT WOULD BE GROUNDS FOR -- AS A DEFENSE?  I

3    AM NOT BEING CLEAR.  I APOLOGIZE.

4            OUR MOTION --

5            **THE COURT:**  I DOUBT IF IT IS A DEFENSE, BUT IT IS

6    NOT GOING TO BE EXCLUDED THAT SOME THINGS ARE EXEMPT.

7            **MS. CHAN:**  WHAT WE WERE TRYING TO GET EXCLUDED WAS

8    THE ARGUMENT THAT BECAUSE CERTAIN ASSETS MIGHT HAVE BEEN

9    EXEMPT, THAT, THEREFORE, BASICALLY NO HARM, NO FOUL.  ALONG THE

10   LINES THAT THE CREDITORS WOULDN'T HAVE BEEN ABLE TO GET IT

11   ANYWAY, SO THERE WAS NO PROBLEM WITH HER CONCEALING THOSE

12   ASSETS.

13           **THE COURT:**  SHE CAN SAY THAT.  I WILL INSTRUCT THE

14   JURY THAT THAT IS NOT THE CASE.  BUT IF THERE IS SOME SORT OF

15   GOOD FAITH DEFENSE AND SHE SAYS, OH, I DIDN'T THINK IT

16   MATTERED, SHE CAN SAY IT AND I WILL SAY, YES, IT DID MATTER AND

17   YOU HAVE TO TELL THE TRUTH WHETHER YOU THOUGHT IT MATTERED OR

18   NOT.

19           **MS. CHAN:**  OKAY.  THANK YOU, YOUR HONOR.

20           **MR. DAVIS:**  YOUR HONOR, I DON'T WISH TO BELABOR THE

21   ADVICE OF COUNSEL MATTER ISSUE, BUT MAY I RAISE ONE ISSUE WITH

22   THE COURT?

23           **THE COURT:**  YES.

24           **MR. DAVIS:**  IN THE DEFENDANT'S OPPOSITION TO OUR

25   MOTIONS IN LIMINE, THEY SAID QUOTE, "MS. CAULDER NOTES,

1   HOWEVER, THAT SHE MAY CHALLENGE THE GOVERNMENT'S PROOF OF

2   SPECIFIC INTENT WITHOUT RAISING THE ADVICE OF COUNSEL DEFENSE."

3           NOW, IN THE EVENT, FOR EXAMPLE, THE DEFENDANT

4   TESTIFIES, WHICH WE ANTICIPATE, AND SHE SAYS, WELL, I DIDN'T

5   THINK I HAD TO DO A OR B, AND SHE DOESN'T SAY ANYTHING MORE

6   OTHER THAN I DIDN'T THINK I HAD TO, MY CROSS-EXAMINATION WE'LL

7   ASK HER, WELL, WHY DIDN'T YOU THINK YOU HAD TO AND SHE SAYS,

8   BECAUSE MY LAWYER TOLD ME I DIDN'T HAVE TO.

9           AT THAT POINT OUR POSITION IS THAT IS AN ADVICE OF

10  COUNSEL DEFENSE.

11          **THE COURT:**  DEFINITELY.

12          **MR. DAVIS:**  I JUST WANTED TO MAKE SURE WE WEREN'T

13  RUNNING AFOUL OF THE COURT'S UNDERSTANDING OF THIS.

14          **THE COURT:**  NO.  THEY SAID THEY WEREN'T.  AND IF

15  THEY, IN FACT, DO, THEN YOU BETTER HAVE MR. AMES SITTING BY HIS

16  PHONE.

17          **MS. SILBERT:**  I THINK THAT MAYBE MR. DAVIS, I DON'T

18  KNOW THAT WE DISAGREE.  I THINK THERE'S A DIFFERENCE BETWEEN

19  THE ADVICE OF COUNSEL DEFENSE AND A STRUCTURED DEFENSE IN THE

20  NINTH CIRCUIT AND WAIVING PRIVILEGE.  CERTAINLY IF PRIVILEGE IS

21  WAIVED, PRIVILEGE IS WAIVED AND MR. AMES CAN BE FORCED TO

22  TESTIFY.  PRIVILEGE COULD BE WAIVED WITHOUT RAISING THE ADVICE

23  OF COUNSEL DEFENSE.

24          **THE COURT:**  OH, RIGHT, OKAY.  IF YOU WAIVE THE

25  PRIVILEGE, THEN --

1    **MS. SILBERT:**  WE UNDERSTAND THE PRIVILEGE AND WE

2  HAVE NOT WAIVED IT AT THIS POINT.  AND WE UNDERSTAND IF WE DO,

3  THAT IS WHAT HAPPENS.

4    **THE COURT:**  AND YOU ARE NOT PLANNING TO.

5    **MS. SILBERT:**  TO WAIVE THE PRIVILEGE?

6    **THE COURT:**  RIGHT.

7    **MS. SILBERT:**  NOT AT THIS POINT.

8    **MR. DAVIS:**  WELL, LET ME ASK, IF I MAY, OF COUNSEL

9  THROUGH THE COURT:  WHEN COUNSEL SAYS "AT THIS POINT," I HAVE

10  HAD THIS OCCUR BEFORE WHERE, FOR EXAMPLE, THE DEFENSE LAWYER

11  SAYS, WE DON'T HAVE ANY EXPERTS THAT WE ARE GOING TO PUT ON THE

12  WITNESS STAND.  THE DAY BEFORE THE TRIAL THEY SAY, WELL, NOW WE

13  HAVE ONE, WE'VE FULLY IDENTIFIED THE PERSON BUT THEY HAVE BEEN

14  TALKING WITH THE PERSON FOR WEEKS.

15    SO, WHEN THEY SAY AT THIS POINT THEY DON'T PLAN TO

16  RAISE ONE, I AM NOT CLEAR WHAT THAT MEANS AND I'M JUST

17  WONDERING IF WE CAN GET A CLARIFICATION OF ANYTHING FURTHER

18  THAT WE MIGHT OBTAIN FROM COUNSEL ON THIS.

19    **MS. SILBERT:**  AT THIS POINT MEANS AS OF TODAY.  I

20  HAVE MET WITH MS. CAULDER AND TALKED WITH HER ABOUT THE CASE

21  AND READ THE DISCOVERY, AND AS OF RIGHT NOW, I HAVE MADE A

22  DECISION NOT TO WAIVE PRIVILEGE VIS-A-VIS MR. AMES, BUT IT MAY

23  BE --

24    **THE COURT:**  SHE IS NOT GOING TO SAY, "MY LAWYER TOLD

25  ME THIS."

1    **MS. SILBERT:**  IT MAY BE AS THE CASE PROGRESSES THAT

2  BECOMES A NECESSARY STATEMENT.  I DON'T KNOW.  I DON'T KNOW

3  WHAT THE GOVERNMENT WITNESSES ARE GOING TO SAY.

4    **MR. DAVIS:**  WELL, WHATEVER THE GOVERNMENT'S

5  WITNESSES SAY DON'T HAVE ANYTHING TO DO WITH WHAT COUNSEL JUST

6  SAID COULD HAPPEN COULD HAPPEN.

7    **THE COURT:**  YOU BETTER SUBPOENA MR. AMES AND HAVE

8  HIM SIT HERE.

9    **MS. SILBERT:**  THEY HAVE SUBPOENAED HIM.

10    **MR. DAVIS:**  THE ISSUE IS NOT ONLY HAVING HIM

11  AVAILABLE, THE ISSUE IS ALSO BEING ABLE TO DISCUSS WITH HIM THE

12  NATURE OF THE CONVERSATIONS WITH THE DEFENDANT IN A WAY THAT

13  DOESN'T PUT US TO THE DISADVANTAGE OF HAVING TO PUT HIM ON COLD

14  ON THE WITNESS STAND WITHOUT HAVING PRETRIED HIM, BEING ABLE TO

15  PRETRY HIM.

16    I WOULD ASK THE COURT IF THE SITUATION ARISES, WOULD

17  THE COURT CONSIDER A SHORT RECESS, MAYBE EVEN AN HOUR, FOR US

18  TO BE ABLE TO TALK TO MR. AMES BEFORE WE PUT HIM ON THE WITNESS

19  STAND?

20    **THE COURT:**  THAT WILL NECESSARILY HAPPEN BECAUSE IF

21  SHE TESTIFIES, THEN YOU CAN'T CALL HIM UNTIL SHE HAS FINISHED

22  HER TESTIMONY.  AS SOON AS SHE SAYS THAT, THEN AT THE NEXT

23  BREAK YOU START TALKING TO MR. AMES.

24    **MR. DAVIS:**  I UNDERSTAND.

25    **THE COURT:**  WHAT YOU ARE SAYING HER TESTIMONY ENDS

1    AT 10:30 AND YOU HAVE NO OTHER WITNESS, THEN CAN YOU TALK TO

2    MR. AMES BEFORE PUTTING HIM ON?  YES.

3            **MR. DAVIS:**  IT MAY ALSO BE, YOUR HONOR, THAT BASED

4    ON WHAT THE DEFENDANT SAYS IN WAIVING THE PRIVILEGE, WE WOULD

5    WANT TO BE ABLE TO TALK TO MR. AMES BEFORE THE CONCLUSION OF

6    THE DEFENDANT'S CROSS-EXAMINATION BECAUSE IT MAY BE INFORMATION

7    HE WILL GIVE US THAT WOULD BE RELEVANT TO THE CROSS.

8            SO, WE WOULD ASK PERMISSION TO INTERRUPT THE CROSS

9    OF THE DEFENDANT IN THE EVENT SHE DOES THAT BECAUSE WE THINK IT

10   COULD BE, NOT NECESSARILY WOULD BE, BUT COULD BE A STRATEGIC

11   PLOY AND WE WOULD LIKE TO BE ABLE TO REACT TO IT.

12           **THE COURT:**  OKAY.

13           **MR. DAVIS:**  THANK YOU VERY MUCH.

14           **MS. SILBERT:**  WE OBJECT AND WILL OBJECT AT THE TIME.

15   BUT I THINK IT WILL BE DEPENDENT ON WHAT IS SAID WHEN, AND WE

16   CAN DEAL WITH IT THEN.

17           **THE COURT:**  WELL, IF YOU WANT TO AVOID ALL THESE

18   THINGS AND YOU KNOW SHE REALLY IS GOING TO SAY THIS, OR YOU --

19   THE LIGHT BULB GOES OFF IN YOUR HEAD SOMETIME BEFORE SHE

20   ACTUALLY SAYS IT, I THINK IT WOULD BE IN YOUR INTEREST TO TELL

21   THEM ABOUT IT.  BECAUSE IF YOU DON'T, SHE SAYS IT, I WILL GIVE

22   THEM WHATEVER THEY NEED.

23           **MS. CHAN:**  FINALLY, YOUR HONOR, THE DEFENDANT IN THE

24   PRETRIAL STATEMENTS INDICATED THAT SHE DOES NOT PLAN TO MAKE AN

25   INSANITY DEFENSE AT THIS POINT.  AND WANTED TO REQUEST THAT THE

1    COURT MAKE A RULING THAT THE TIME TO MAKE SUCH A DEFENSE HAS

2    EXPIRED UNDER RULE 12.2 BECAUSE THERE HAS NOT BEEN A PRETRIAL

3    MOTION.

4            **THE COURT:**  I THINK THAT ONE IS CORRECT.

5            **MS. SILBERT:**  I HAVE NO FACTS ON WHICH -- I KNOW OF

6    NOTHING WHICH WOULD GIVE A BASIS FOR AN INSANITY DEFENSE.

7            **THE COURT:**  IF THERE WERE ONE, IT WOULD BE EXCLUDED

8    UNDER THE RULE.

9            ANYTHING ELSE?

10           **MS. SILBERT:**  YES, YOUR HONOR, I APOLOGIZE.  I KNOW

11   THAT MR. DAVIS AND MYSELF APPEARED BEFORE THIS COURT FOR A

12   TRIAL IN DECEMBER AND I DO REMEMBER THAT THE COURT HAD A

13   PARTICULAR PREFERENCE REGARDING VOIR DIRE, AND I WANTED TO -- I

14   REMEMBER WE MADE SOME MISTAKES AND I WANTED TO ASK THE COURT TO

15   TELL ME AGAIN HOW IT IS THAT THE COURT WOULD LIKE THE VOIR DIRE

16   DONE.

17           IT IS SOMEWHAT CUMBERSOME WHEN MR. DAVIS AND I

18   APPEARED IN DECEMBER.

19           **THE COURT:**  WERE YOU THE ONE?

20           **MR. DAVIS:**  IT WAS MR. KELLER AND MS. HALBERT WERE

21   ALSO HERE.  I BELIEVE WHAT HAPPENED WAS, THERE WAS AN ISSUE --

22           **THE COURT:**  IS THIS THE ONE WHERE I TRIED TO HAVE

23   YOU ALL DO THE VOIR DIRE AND IT DIDN'T WORK OUT THAT WELL?

24           **MR. DAVIS:**  THERE WERE FOLLOW-UP QUESTIONS AND THERE

25   WAS AN ISSUE WITH THE PASSING OF THE MICROPHONE THAT MADE IT

1    SOMEWHAT AWKWARD.

2         **THE COURT:**  WELL, I WOULD PREFER NOT TO DO THE VOIR

3    DIRE.  I WOULD PREFER TO HAVE YOU ALL DO IT IF YOU WOULD ASK

4    THE QUESTIONS THAT I WOULD ALLOW YOU TO ASK AS QUICKLY AS I

5    WOULD ASK THEM.  BECAUSE I GET BORED HAVING TO ASK THEM OVER

6    AND OVER AND TRIAL AFTER TRIAL.  HOWEVER, IF THAT CAN'T BE

7    DONE, THEN I WILL DO IT MYSELF.  SO --

8         **MS. CHAN:**  I WILL ASK THEM.

9         **THE COURT:**  WHAT I WOULD DO IS MAKE YOU A LIST OF

10   THE QUESTIONS I WOULD PLAN TO ASK AND IF YOU ALL CAN REACH AN

11   AGREEMENT ABOUT ASKING THOSE QUESTIONS AND NO OTHER QUESTIONS,

12   AND ASKING THEM IN ORDER SO THAT THE MICROPHONE -- ONE PROBLEM

13   THAT HAPPENED WAS SOMEBODY WANTED TO BE ASKING THIS PERSON ONE

14   QUESTION, THEN SOMEBODY ELSE IN THE BACK ANOTHER QUESTION AND

15   IT JUST BECAME CUMBERSOME TRYING TO PASS THE MICROPHONE ON.

16        IT HAS TO BE DONE IN ORDER BECAUSE THAT'S THE ONLY

17   REASONABLE WAY TO PASS THE MICROPHONE.  AND YOU WOULD HAVE TO

18   AGREE THAT EITHER ONE OF YOU WOULD TAKE THE FIRST ONE AND ONE

19   THE SECOND, OR ONE WOULD TAKE THE FIRST HALF OF THE QUESTIONS

20   AND THE OTHER THE SECOND HALF OF THE QUESTIONS, OR SWITCH; I

21   DON'T KNOW HOW YOU'D WANT TO DO IT.

22        BUT IF YOU COULD COME UP WITH SOMETHING AND YOU

23   PROMISE JUST TO ASK MY QUESTIONS PLUS VERY REASONABLE FOLLOW-UP

24   LIKE, I DIDN'T HEAR YOU, MA'AM, OR HOW OLD IS YOUR CHILD,

25   SOMETHING LIKE THAT, THEN I WOULD ACTUALLY PREFER THAT YOU DO

1    IT.

2              **MS. SILBERT:**  AND WE WOULD PREFER TO DO IT, BOTH

3    SIDES.

4              **MR. DAVIS:**  I'M SORRY?

5              **MS. SILBERT:**  I THINK BOTH SIDES WOULD PREFER TO DO

6    IT.

7              **MR. DAVIS:**  JUST TO CLARIFY, I DO REMEMBER THAT WE

8    WERE ALLOWED SOME MODEST AMOUNT OF TIME TO ASK FOLLOW-UP

9    QUESTIONS.

10             **THE COURT:**  I DON'T REMEMBER WHICH CASE YOU'RE

11   TALKING ABOUT.  THE ONLY ONE THAT I REMEMBER IS THIS ONE WHERE

12   WE HAD THE MICROPHONE PROBLEM.

13             **MR. DAVIS:**  RIGHT.  SAME CASE.

14             **THE COURT:**  AND THE FOLLOW-UP QUESTIONS CAN BE ONLY

15   OBVIOUS FOLLOW-UP QUESTIONS.  LIKE SHE SAYS:

16             MY DAUGHTER WORKED FOR A BANK.

17             WAS IT WELLS FARGO?

18             SOMETHING LIKE THAT.

19             NOT:  MY DAUGHTER WORKED FOR A BANK.

20             DO YOU BELIEVE IN THE PRESUMPTION OF INNOCENCE?

21             MY DAUGHTER WORKED FOR A BANK.

22             DO YOU BELONG TO MADD?

23             YOU KNOW.

24             **MR. DAVIS:**  RIGHT.

25             SO AT THE -- I'M SORRY TO BELABOR THIS, BUT I WANT

1    TO MAKE SURE I DON'T RUN AFOUL OF WHAT THE COURT WANTS.

2           AFTER THESE INITIAL QUESTIONS YOU'VE INDICATED YOU

3    WOULD HAVE US ASK, ARE WE THEN FREE FOR SOME PERIOD OF TIME TO

4    ASK OTHER QUESTIONS?

5           **THE COURT:**  NO.

6           **MR. DAVIS:**  NO.

7           **THE COURT:**  ONLY AT THE TIME.

8           YOU'RE TALKING TO MRS. ASH.  SHE SAYS, MY DAUGHTER

9    WENT TO A THERAPIST WHOSE NAME STARTED WITH S-C.

10          YOU SAY, OH, WAS IT SHARON CAULDER?

11          LIKE THAT.  YOU SAY IT RIGHT ON THE SPOT.  I THINK

12   YOU WOULD -- I AM HOPING WE WOULD ALL AGREE ON WHAT WOULD BE AN

13   OBVIOUS FOLLOW-UP QUESTION AND ONE THAT WOULD BE AN EXCUSE TO

14   STEP OFF INTO SOMETHING THAT I HAD NO INTENTION OF LETTING YOU

15   ASK.

16          **MR. DAVIS:**  THE REASON I ASK THAT IS BOTH SIDES ARE

17   INTERESTED, FOR EXAMPLE, IN PROSPECTIVE JURORS' EXPERIENCE WITH

18   BANKRUPTCY.  WE MAY VARY IN TERMS OF WHAT INFORMATION WE WANT

19   OR WHAT QUESTIONS WE WOULD ASK, BUT THOSE ARE APART FROM THE

20   TYPE OF STANDARD QUESTIONS THE COURT WOULD TYPICALLY --

21          **THE COURT:**  OH, NO, I WILL GIVE YOU THE LIST.

22          **MR. BLANK:**  SO THE COURT WILL NOT ENTERTAIN MORE

23   ARGUMENT.  I DON'T THINK ANY IS NEEDED.  THERE ARE A COUPLE OF

24   DISPUTES BETWEEN THE PARTIES ABOUT WHAT VOIR DIRE IS

25   APPROPRIATE --

1          THE COURT:  I WILL GIVE YOU THE LIST.

2          MR. BLANK:  THE COURT WILL RULE AND THEN WE'LL

3     HAVE --

4          THE COURT:  I WILL GIVE YOU A LIST OF QUESTIONS AND

5     YOU WILL READ THEM.

6          MS. SILBERT:  MS. CHAN AND I TALKED BEFORE.  IF

7     PERHAPS WE CAN HAVE THE LIST BY THE END OF THE DAY THURSDAY.

8          THE COURT:  OH, YES.  I WILL TRY AND DO IT BY

9     TOMORROW.

10          MS. SILBERT:  IF --

11          THE COURT:  I JUST -- I USE MY USUAL ONES AND I WENT

12     THROUGH YOURS, AND CIRCLED THE ONES I LIKED.  SO ALL I HAVE TO

13     DO IS TYPE THEM UP AND PUT THE ONES THAT YOU SUGGESTED IN WITH

14     THE ONES I NORMALLY DO THAT I AM SURE YOU ARE FAMILIAR WITH,

15     AND THEN I WILL GIVE THEM TO YOU HOPEFULLY TOMORROW, AND THEN

16     YOU CAN FIGURE OUT HOW YOU WANT TO DIVIDE IT UP.

17          IF IT DOESN'T WORK, I WILL TAKE OVER AND TO IT

18     MYSELF.

19          MS. SILBERT:  I HAVE NO OBJECTION AND I ASSUME

20     MS. CHAN HAS NO OBJECTION IF THE COURT WANTS TO SEND US

21     SOMETHING LIKE THAT, WE CAN RECEIVE AN E-MAIL FROM MS. CAHILL,

22     IF THAT IS EASIER.  PAPER IF FINE, BUT GIVEN THE THREE-DAY

23     WEEKEND, I AM ANTICIPATING THAT E-MAILS MIGHT END UP --

24          MR. DAVIS:  YOUR HONOR, I REMEMBER THE COURT USED

25     THE ARIZONA SYSTEM LAST TIME.  ARE YOU STILL USING THE ARIZONA

PAGES 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>        PLAINTIFF, )<br><br> VS. )<br><br>SHARON LEE CAULDER, )<br><br>        DEFENDANT. )<br>_____ ) | **CERTIFIED COPY**<br><br>NO. CR-04-40016 CW<br><br>THURSDAY, NOVEMBER 10, 2005<br><br>OAKLAND, CALIFORNIA |

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**FOR PLAINTIFF:**          KEVIN R. RYAN,
                    UNITED STATES ATTORNEY
                    1301 CLAY STREEET
                    OAKLAND, CALIFORNIA  94612
          BY:  **MERRY JEAN CHAN,**
               **LEWIS A. DAVIS,**
               **ASSISTANT UNITED STATES ATTORNEYS**


**FOR DEFENDANT:**          BARRY PORTMAN,
                    FEDERAL PUBLIC DEFENDER
                    555 12TH STREET, SUITE 650
                    OAKLAND, CALIFORNIA 94607
          BY:  **REBECCA SILBERT,**
               **ASSISTANT FEDERAL PUBLIC DEFENDER**


**REPORTED BY:**          **DIANE E. SKILLMAN, CSR 4909, RPR, FCRR**
                    **OFFICIAL COURT REPORTER**

1      **MS. CHAN:**  I THINK THE VERDICT FORM, THE GOVERNMENT

2  OPPOSES THE DEFENDANT'S PROPOSED VERDICT FORM.

3      **THE COURT:**  OKAY.  ANYTHING ELSE?

4      **MS. CHAN:**  I THINK WE WOULD LIKE TO RAISE AN ISSUE

5  WITH RESPECT, AGAIN, TO RECIPROCAL DISCOVERY, NOTICE ABOUT

6  EXPERT WITNESSES FROM THE DEFENSE AND WAIVER OF THE

7  ATTORNEY-CLIENT PRIVILEGE; THAT THOSE ARE -- THOSE ARE NOT

8  OBJECTIONS PER SE, BUT ISSUES THAT WE WOULD LIKE TO ADDRESS.

9      **THE COURT:**  OKAY.  DO YOU HAVE ANY FURTHER NEWS ON

10  WHETHER YOU ARE GOING TO BE WAIVING THE PRIVILEGE OR CALLING AN

11  EXPERT?

12      **MS. SILBERT:**  ON THE ISSUE -- LET ME BACK UP.

13      THE GOVERNMENT KNOWS THAT WE, AS THEY, HAVE

14  SUBPOENAED CLAUDE AMES --

15      **THE REPORTER:**  I'M SORRY, COUNSEL.  YOU NEED TO

16  SPEAK UP.

17      **MS. SILBERT:**  I'M SORRY.  THE GOVERNMENT KNOWS THAT

18  WE, AS HAS THE GOVERNMENT, SUBPOENAED CLAUDE AMES, HER FORMER

19  ATTORNEY, AND I HAVE SPOKEN WITH HIM.  WE WOULD VERY MUCH LIKE

20  TO KEEP THE PRIVILEGE.  HE IS A FACT WITNESS TO THINGS THAT

21  OCCURRED THAT ARE NOT PRIVILEGED.  OF COURSE, HE WAS PRESENT AT

22  THE 341 HEARING, WHICH IS, OBVIOUSLY, NOT A PRIVILEGED

23  PROCEEDING.

24      I HAVE NOT RETAINED HIM AS AN EXPERT.  I DO NOT

25  INTEND TO RETAIN HIM AS AN EXPERT.  IF I WERE GOING TO RETAIN

1    HIM AS AN EXPERT OR USE HIM AS AN EXPERT, I WOULD NOT HAVE

2    SUBPOENAED HIM --

3          **THE COURT:**  I THINK THEY ARE REFERRING TO OTHER

4    POSSIBLE EXPERTS, AS WELL AS HIM.

5          **MS. SILBERT:**  NO, BECAUSE THE ONLY ISSUES ON WHICH

6    WE BELIEVE EXPERT TESTIMONY WOULD BE RELEVANT ARE LEGAL ISSUES

7    WHICH ARE BEING ADDRESSED IN THE CONTEXT OF A LEGAL

8    INSTRUCTION.  SO THAT IS WHERE WE ARE ARGUING.

9          **THE COURT:**  SO YOU ARE SAYING YOU AREN'T GOING TO BE

10   CALLING AN EXPERT?

11         **MS. SILBERT:**  NOT BASED ON -- AT THIS POINT, NOT

12   BASED ON ANYTHING THAT THEY HAVE DISCLOSED OR THAT I HAVE HEARD

13   SO FAR.  THE ONLY REASON THAT WE EVER SOUGHT FOR AN EXPERT WAS

14   THE ISSUE OF THE BANKRUPTCY PROCEEDING, AND ALL OF OUR ISSUES

15   ARE BEING DEALT WITH IN THE CONTEXT OF A LEGAL INSTRUCTIONS.

16         **THE COURT:**  OKAY.  AND YOU ARE NOT PLANNING ON

17   ASKING MR. AMES ANY QUESTIONS ABOUT WHAT HE TOLD HER OR SHE

18   TOLD HIM, OR HOPING TO QUESTION HIM WITHOUT DOING ANYTHING LIKE

19   THAT?

20         **MS. SILBERT:**  NOT NOW --

21         **THE COURT:**  YOU ARE HOPING TO QUESTION HER.  IF SHE

22   TESTIFIES WITHOUT SAYING ANYTHING ABOUT MY ATTORNEY TOLD ME OR

23   I THOUGHT SOMETHING BASED ON MY ATTORNEY --

24         **MS. SILBERT:**  RIGHT.  AND THAT COULD CHANGE,

25   OBVIOUSLY.  WE HAVEN'T HEARD THE GOVERNMENT'S WITNESSES.

1        **THE COURT:**  YOU KNOW WHAT THEY ARE GOING TO SAY.

2        **MS. SILBERT:**  I DON'T ACTUALLY.  I DON'T KNOW WHAT

3   MS. LOO IS GOING TO SAY.  THERE ARE MANY FACTS THAT ARE NOT

4   DISPUTED, BUT ON THE BANKRUPTCY AREA, IN PARTICULAR, MS. LOO'S

5   TESTIMONY IS QUITE CRITICAL AS TO HOW THAT COMES IN.

6        **THE COURT:**  OKAY.  WELL, THERE'S NOTHING I CAN DO.

7   IF THEY WAIVE THE PRIVILEGE, WE WILL TAKE A RECESS AND YOU CAN

8   INTERVIEW MR. AMES.

9        **MR. DAVIS:**  THAT'S FINE, YOUR HONOR.  THANK YOU.

10        **MS. SILBERT:**  I'M SORRY, YOUR HONOR.  I SHOULD NOTE

11  THAT MR. AMES DID LEAVE ME A VOICE MAIL SAYING THAT AS SOON AS

12  I LET HIM KNOW THAT WE WERE WAIVING PRIVILEGE, HE WOULD BE

13  WILLING TO MEET WITH THEM.  HE DOES WANT TO MEET WITH ALL

14  PARTIES TOGETHER, BUT HE'S ABSOLUTELY WILLING TO MEET WITH

15  THEM.

16        **MR. DAVIS:**  WELL, LET ME JUST SAY, IF I MAY,

17  MR. AMES HAS DECLINED TO MEET WITH US CITING THE PRIVILEGE.  WE

18  DO NOT BELIEVE THAT MS. SILBERT WILL BE ABLE TO ASK HIM ANY

19  QUESTIONS WHICH WILL NOT VIOLATE THE PRIVILEGE.

20        FOR EXAMPLE, IF SHE SAYS:  "DID YOU REPRESENT

21  MS. CAULDER IN THE BANKRUPTCY PROCEEDING?"  AND HE SAYS "YES,"

22  SHE WILL THEN ASK HIM A QUESTION ABOUT WHAT HAPPENED AT THE

23  MEETING, AT THE CREDITORS MEETING.  HE WILL THEN SAY, WE

24  BELIEVE, "I DON'T REMEMBER."

25        WELL, HIS SAYING HE DOESN'T REMEMBER, OPENS UP THE

1    QUESTION OF WHAT WAS IT HE KNEW WHEN HE WENT TO THE MEETING,

2    AND THAT WILL IMPLICATE CONVERSATIONS THAT HE HAD WITH

3    MS. CAULDER.

4         I THINK THE EFFORT BY THE DEFENSE HERE IS TO SAY SHE

5    WILL NAVIGATE THESE WATERS IS QUESTIONABLE.  I DON'T CHALLENGE

6    HER INTENT, BUT I THINK THE REALITY OF BEING ABLE TO ASK HIM

7    QUESTIONS AS TO NOT IMPLICATE THE PRIVILEGE AND CONSTITUTE A

8    WAIVER, ARE THE CHANCES OF THAT HAPPENING ARE ABOUT ZERO

9    BECAUSE NOTHING THAT HE CAN SAY --

10        **THE COURT:**  WELL, THAT'S THE CHANCE SHE WILL TAKE IF

11   SHE CALLS HIM.

12        **MR. DAVIS:**  VERY WELL.

13        **MS. CHAN:**  WE ALSO ATTEMPTED TO SPEAK TO MR. AMES

14   AND ASKING HIM FACT QUESTIONS.  HE HAS CITED THE PRIVILEGE.

15   SO, HIS UNDERSTANDING OF THE PRIVILEGE APPEARS TO BE BROADER

16   PERHAPS THAN DEFENSE COUNSEL'S.

17        **THE COURT:**  OKAY.  WELL, I'LL HAVE TO DECIDE WHAT IS

18   PRIVILEGED WHEN HE GETS UP ON THE STAND.

19        **MR. DAVIS:**  THANK YOU VERY MUCH.

20        **MS. CHAN:**  THANK YOU, YOUR HONOR.

21        **THE COURT:**  OKAY.  SO, YOU RESOLVED THE HORSE

22   PROBLEMS?

23        **MS. CHAN:**  YES, WE DID.

24        **MS. SILBERT:**  WE DID.  I BELIEVE SINCE WE ARE

25   STIPULATING TO THE PHOTOGRAPHS, NONE OF THE HORSE WITNESSES

1    UP FOR ONE REASON OR ANOTHER.

2            **THE COURT:**  I WILL JUST SAY, THE COURT.  OR, IN THE

3    END, IT'S UP TO THE COURT, OR WHATEVER.  BECAUSE EVEN IF BOTH

4    SIDES AGREE WE WANT TO CALL THIS A GIVE, IF IT REALLY WASN'T A

5    GIFT, THEY CAN'T MAKE IT ONE BY CALLING IT ONE.  AND THAT, I

6    THINK, NEEDS TO BE SAID.

7            THEN THIS LAST SENTENCE, LAST PARAGRAPH IS

8    CONFUSING.  IT SAYS, DEDUCTIONS, SUCH AS TAX DEDUCTIBLE

9    GIFTS -- NOW, A GIFT IS NOT TAX DEDUCTIBLE.  A GIFT IS

10    NONTAXABLE; ISN'T THAT RIGHT?  A BUSINESS EXPENSE OR A DONATION

11    IS TAX DEDUCTIBLE.  A GIFT IS NONTAXABLE.

12            **MS. CHAN:**  I ACTUALLY INTENDED THAT TO BE CHARITABLE

13    DONATIONS OR CHARITABLE GIFTS.

14            **THE COURT:**  WHEN YOU SAY GIFTS -- OH, I SEE.

15            **MS. CHAN:**  A WORD IS MISSING THERE.  WHEN I DRAFTED

16    IT, I INITIALLY MEANT IT TO MEAN CHARITABLE GIFTS.

17            **MS. SILBERT:**  SO WE CAN SAY SUCH AS DONATIONS OR

18    BUSINESS EXPENSES.

19            **THE COURT:**  THAT WOULD BE BETTER BECAUSE I THOUGHT

20    YOU WERE TRYING TO INCLUDE THE GIFT, THE CLAIMED GIFT.  THAT

21    ISN'T AN ITEMIZED DEDUCTION.

22            **MS. CHAN:**  NO, THAT'S NOT.

23            **THE COURT:**  OKAY.  I AM NOT SURE WE EVEN NEED

24    THIS ITEM.  I GUESS WE DO BECAUSE THERE'S AN ISSUE ABOUT THE

25    BUSINESS EXPENSES.

1          AND YOU GOT THE VOIR DIRE.

2          **MS. SILBERT:**  YES, WE DID.

3          **THE COURT:**  ARE YOU GOING TO BE ABLE TO WORK WITH

4     THAT?

5          **MS. SILBERT:**  YES.

6          **THE COURT:**  WORK WITH EACH OTHER ON DOING THE VOIR

7     DIRE.

8          **MS. SILBERT:**  THE ONLY ISSUE I RAISED WITH MS. CHAN

9     WAS THAT THE COURT HAD DESIGNATED FOR THE ATTORNEYS A QUESTION

10    ABOUT RACIAL BIAS.  WE WOULD BE MORE COMFORTABLE IF THE COURT

11    ASKED THAT QUESTION.

12         **THE COURT:**  OR NOT.  WE DON'T NEED TO ASK IT.  IF

13    YOU DON'T WANT IT, WE DON'T NEED ANYONE TO ASK IT.

14         **MS. SILBERT:**  I THINK IT NEEDS TO BE ASKED, BUT I

15    THINK WE BOTH RAISED THE ISSUE OF --

16         **THE COURT:**  I DON'T MIND ASKING IT.  I COULD ASK IT

17    TO THE PANEL AS A WHOLE.

18         **MS. SILBERT:**  I BELIEVE THERE WERE A FEW QUESTIONS

19    THAT THE COURT INDICATED.  IF WE CAN MOVE THAT QUESTION UP

20    THERE.

21         **THE COURT:**  DO IT TO THE PANEL AS A WHOLE?

22         **MS. SILBERT:**  YES, PLEASE.

23         **MS. CHAN:**  YES, YOUR HONOR.

24         **THE COURT:**  OKAY.

25         OKAY.  WELL, THEN, THERE SEEMED, WHEN I READ YOUR

1      **MR. DAVIS:**  WE WILL LOOK AT IT AGAIN JUST TO

2  DOUBLE-CHECK.

3      **THE COURT:**  IF SHE DOESN'T TESTIFY AND DOESN'T PUT

4  ON ANYTHING THAT RAISES THAT SORT OF I DIDN'T KNOW I HAD TO

5  FILE TYPE DEFENSE, I WOULDN'T THINK YOU WOULD NEED IT.

6      **MS. CHAN:**  WE WILL LOOK AT THE LAW AGAIN, BUT I

7  BELIEVE THE LAW DOES STATE THE GOVERNMENT HAS THE BURDEN OF

8  SHOWING THE INTENT REGARDLESS OF WHETHER SHE BRINGS UP THE GOOD

9  FAITH DEFENSE.

10      **THE COURT:**  BUT, I MEAN, IT'S PRETTY OBVIOUS ABSENT

11  SOMETHING, IT'S PRETTY OBVIOUS THAT PEOPLE KNOW THEY ARE

12  SUPPOSED TO FILE THEIR TAX RETURNS.

13      OKAY.  SO, MY LAST QUESTION IS, NOW WE HAVE ALL

14  THESE STIPULATIONS, CAN WE TELL THE JURY IT WON'T BE QUITE AS

15  LONG OF A CASE?  I WAS GOING TO TELL THEM THEY NEEDED TO BE

16  PREPARED FOR A THREE-WEEK TRIAL, BUT I DON'T THINK THIS WILL BE

17  A THREE-WEEK TRIAL ANYMORE.

18      **MS. CHAN:**  NO.

19      **THE COURT:**  WHAT SHOULD I TELL THEM, TWO WEEKS?

20      **MS. CHAN:**  ONE TO TWO WEEKS.

21      **MR. DAVIS:**  TWO WEEKS BEING THE OUTSIDE.

22      **MS. SILBERT:**  THE PROBLEM IS THAT THE SECOND WEEK IS

23  THANKSGIVING WEEK.  I DON'T THINK IT WILL LAST TWO WEEKS.  I

24  CAN'T IMAGINE IT GOING PASSED, FOR EXAMPLE, NOVEMBER 30TH.

25  THAT WOULD BE --

1          **MS. SILBERT:**  YES.

2          **MS. CHAN:**  YES.

3          **MS. SILBERT:**  WAIT AND SEE --

4          **THE COURT:**  WE CAN WAIT AND SEE IF THERE IS ANY

5    EVIDENCE THAT HE IS AN ACCOMPLICE TO ANYTHING.

6          **MS. CHAN:**  THANK YOU, YOUR HONOR.

7          **THE COURT:**  OKAY.

8          **MR. DAVIS:**  8:30 MONDAY MORNING?

9          **THE COURT:**  RIGHT.  UNLESS, I PRESUME YOU HAVE

10   EXHAUSTED ALL POSSIBLE AVENUES OF DISPOSING OF THE CASE.

11         **MS. SILBERT:**  I BELIEVE SO.

12         **MS. CHAN:**  WE HAVE.

13         **THE COURT:**  YOU'VE MADE OFFERS?

14         **MS. CHAN:**  WE HAVE MADE AN OFFER, AND I THINK IT'S

15   BEEN CLEAR THAT NOTHING IS GOING TO BE REACHED.  THAT'S -- I

16   HAVE GOTTEN FROM THE DEFENSE.

17         **THE COURT:**  OKAY.

18         **MS. SILBERT:**  THANK YOU.

19

20         (WHEREUPON THE PROCEEDINGS ADJOURNED.)

21

22

23

24

25

PAGES 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

COPY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | NO. CR-04-40016 CW |
| | ) | |
| VS. | ) | |
| | ) | WEDNESDAY, MAY 31, 2006 |
| SHARON CAULDER, | ) | |
| | ) | |
| | ) | OAKLAND, CALIFORNIA |
| | ) | |
| DEFENDANT. | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | C-04-3912 CW |
| | ) | |
| $185,830.08, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| _____ | ) | |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**          KEVIN R. RYAN,
                           UNITED STATES ATTORNEY
                           1301 CLAY STREEET
                           OAKLAND, CALIFORNIA  94612
                    **BY:  MERRY JEAN CHAN,**
                           ASSISTANT U.S. ATTORNEY

                     (APPEARANCES CONTINUED:)

REPORTED BY:               DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                           **OFFICIAL COURT REPORTER**

```
 1

 2   FOR DEFENDANT:          BARRY PORTMAN,
                             FEDERAL PUBLIC DEFENDER
 3                           555 12TH STREET, STE. 650
                             OAKLAND, CALIFORNIA 94607
 4                     BY:   REBECCA SILBERT,
                             ASSISTANT FEDERAL PUBLIC DEFENDER
 5

 6   FOR CHAPTER 7           KORNFIELD, PAUL & NYBERG
     TRUSTEE:                1999 HARRISON STREET, STE. 2675
 7                           OAKLAND, CALIFORNIA 94612
                       BY:   ERIC A. NYBERG, ESQUIRE
 8

 9   ALSO PRESENT:           CONSTANCE COOK, U.S. PROBATION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    AND IT WILL BE A CONDITION OF YOUR SUPERVISED RELEASE THAT YOU

2    PAY THOSE.

3              THE OTHER CONDITIONS OF SUPERVISED RELEASE ARE THE

4    USUAL TERMS AND CONDITIONS, PLUS PROVIDING THE PROBATION

5    OFFICER WITH ACCESS TO FINANCIAL INFORMATION, NOT OPENING NEW

6    LINES OF CREDIT OR INCURRING NEW DEBT WITHOUT PERMISSION OF

7    PROBATION, PROVIDING PROBATION WITH ANY AGREEMENTS WITH THE IRS

8    PARTICIPATING IN --

9              **MS. SILBERT:**  WE STRONGLY OBJECT TO THAT, YOUR

10   HONOR.  IT WOULD BE A WASTE OF MONEY.

11             **THE COURT:**  OKAY.  I WON'T IMPOSE THE MENTAL HEALTH

12   CONDITION.

13             SUBMIT TO A SEARCH CONDITION, NOT OWN OR POSSESS ANY

14   FIREARMS, PARTICIPATE IN THE COLLECTION OF DNA.

15             **MS. CHAN:**  YOUR HONOR, THE GOVERNMENT THINKS THAT

16   THE MENTAL HEALTH CONDITION IS NECESSARY.  MS. CAULDER HAS

17   INDICATED, I THINK, RECENTLY IN HER WRITINGS TO THE COURT THAT

18   DURING THE PENDENCY OF THE BANKRUPTCY THAT SHE WAS, YOU KNOW,

19   BECAUSE OF HER MENTAL HEALTH ISSUES, SHE WAS NOT ABLE TO

20   COGENTLY PARTICIPATE, I GUESS, IN THE BANKRUPTCY PROCEEDINGS.

21             IT SEEMS THAT THE MENTAL HEALTH CONDITION WOULD BE

22   WARRANTED IN THIS CASE.

23             **THE COURT:**  I AM NOT GOING TO IMPOSE ONE.  I DON'T

24   THINK THAT IS GOING TO BE --

25             **MS. SILBERT:**  CAN WE MAKE A RECOMMENDATION THAT SHE

1    BE NEAR NORTH PLAINFIELD, NEW JERSEY, WHICH IS WHERE SHE WILL

2    BE LIVING WITH HER DAUGHTER, AND HER DAUGHTER WILL BE HANDLING

3    ALL HER AFFAIRS.

4         **THE COURT:**  YES.  NOW, SHE'S GOING TO BE ON BAIL

5    PENDING APPEAL, SO WHAT DO WE DO ABOUT THAT?  SHE TURNS HERSELF

6    IN WITHIN 20 DAYS OF THE ISSUANCE OF THE MANDATE OR DO I SET A

7    SPECIFIC DATE?

8         **MS. CHAN:**  I THINK THE FIRST OPTION IS FINE.

9         **MS. SILBERT:**  I THINK IT IS A CERTAIN NUMBER OF DAYS

10   OF THE ISSUANCE OF THE MANDATE.  MS. CHAN AND I WILL LOOK IT UP

11   AND IF IT NEEDS TO BE CLARIFIED, WE WILL DO THAT WITHIN 24

12   HOURS.

13        **THE COURT:**  OKAY.

14        **MS. CHAN:**  YOUR HONOR, THE GOVERNMENT ALSO REQUESTS

15   THAT A SPECIAL CONDITION BE THAT MS. CAULDER NOT PRACTICE

16   UNLICENSED THERAPY AND ALSO TO STAY AWAY FROM CLIENT,

17   SPECIFICALLY, MR. DE LA CRUZ.

18        **THE COURT:**  I AM NOT GOING TO DO THAT.

19   MR. DE LA CRUZ CAN STAY AWAY FROM HER.  I AM CERTAIN THAT HE

20   WILL.

21        ANYTHING ELSE?

22        **MS. SILBERT:**  THAT'S ALL --

23        **MS. CHAN:**  THE COST OF PROSECUTION, YOUR HONOR.

24        **THE COURT:**  I AM NOT GOING TO IMPOSE THAT.  SHE PAYS

25   HER TAXES, WE WILL BE LUCKY.

1    **PROBATION OFFICER:**  I WOULD JUST ASK, YOUR HONOR, IF

2    SOMEONE, MS. SILBERT, CAN NOTIFY ME SO I CAN LET PRETRIAL

3    SERVICES KNOW WHETHER I NEED TO TALK TO NEW ORLEANS OR NEW

4    JERSEY BECAUSE I WILL HAVE TO FORWARD ALL THE DOCUMENTATION SO

5    THEY CAN SUPERVISE HER.

6    **THE COURT:**  WHERE IS SHE BEING SUPERVISED NOW?

7    **MS. SILBERT:**  NEW ORLEANS.

8    **PROBATION OFFICER:**  NEW ORLEANS, BUT HER PLAN IS TO

9    RESIDE WITH HER DAUGHTER IN NEW JERSEY.

10    **THE COURT:**  IS THAT RIGHT?

11    **MS. SILBERT:**  IT IS.

12    **THE COURT:**  EVEN NOW?  YOU WERE SAYING AFTER HER

13    SENTENCE, BUT EVEN NOW SHE'S GOING TO DO THAT?

14    **MS. SILBERT:**  YES, BECAUSE OF KATRINA.  SHE LOST

15    EVERYTHING SO SHE'S MOVING OUT.  I THINK WE WILL BE ABLE TO

16    STAY IN CONTACT WITH PRETRIAL SERVICES.

17    **THE COURT:**  THE THING IS, I WANT HER PRETRIAL

18    SERVICES OFFICER TO KNOW ABOUT THE REQUIREMENT OF HER MAKING

19    PROGRESS ON HER TAX RETURNS.  SO, WE NEED SOMEBODY TO BE AWARE

20    THAT SHE NEEDS TO TURN IN HER PROGRESS EACH WEEK OR EACH MONTH,

21    SO THAT WE CAN MAKE SURE THIS IS HAPPENING.

22    **PROBATION OFFICER:**  OKAY.

23    **MS. SILBERT:**  YOUR HONOR, ONE OTHER ISSUE.  I CAN

24    EITHER -- WE CAN SIDEBAR OR I CAN INFORM THE COURT THAT

25    MR. PORTMAN HAS AUTHORIZED ME TO ASK THE COURT TO APPOINT

Docket No. 06-10355

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SHARON LEE CAULDER,

Defendant-Appellant.

On Appeal from the Judgment and Conviction in
District Court Case No. CR 04-40016-CW
In the United States District Court for
the Northern District of California
(Claudia Wilken, U.S.D.J., Presiding)

**BRIEF OF APPELLANT**

KAREN L. LANDAU, CSB # 128728
Attorney at Law
2626 Harrison Street
Oakland, California 94612
(510) 839-9230

Attorney for Appellant
Sharon Caulder

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................... iii

I.    JURISDICTION AND TIMELINESS ............................. 1

II.   CUSTODY STATUS .......................................... 1

III.  ISSUES PRESENTED FOR REVIEW ............................. 1

IV.   STATEMENT OF THE CASE ................................... 2

      Statement of Facts ...................................... 3

      1.  The Bankruptcy Fraud Case and Evidence of Expenditures.... 3

      2.  Failure to File ..................................... 7

      3.  Evidence Regarding Payment for Services Rendered. ......... 8

      4.  The Defense Case .................................... 13

VI.   STANDARD OF REVIEW ..................................... 14

VII.  SUMMARY OF ARGUMENT .................................... 15

VIII. ARGUMENT ............................................... 16

A.    THE DISTRICT COURT ERRED WHEN IT PROVIDED JURY INSTRUCTIONS
DESCRIBING BANKRUPTCY LAW IN A MANNER THAT EFFECTIVELY DIRECTED A
VERDICT FOR THE GOVERNMENT. ................................. 16

      1.  Background .......................................... 16

      2.  The District Court's Instructions Were Unduly
      Argumentative, Displayed Judicial Bias In Favor Of The
      Prosecution, And Directed The Jury To Consider Irrelevant And
      Prejudicial Matters. ...................................... 19

      3.  The Jury Instructions Urged Conviction Based on an
      Inference Not Supported by the Evidence. .................... 24

      4.  The Error Was Not Harmless. ......................... 26

B.    THE DISTRICT COURT ERRED IN DECLINING TO DISCLOSE THE
PSYCHIATRIC RECORDS OF GOVERNMENT WITNESS MICHAEL DE LA CRUZ,
WHEN DE LA CRUZ WAS THE PRIMARY WITNESS AGAINST APPELLANT
CAULDER. ................................................... 27

C.   THE COURT ERRED IN RESTRICTING CROSS-EXAMINATION ON DE LA CRUZ'S MENTAL STATE. ........................................ 29

D.   THE DISTRICT COURT'S SENTENCE WAS UNREASONABLE. .......... 32

IX.   CONCLUSION ............................................. 35

STATEMENT OF RELATED CASES ................................... 36

CERTIFICATE OF COMPLIANCE .................................... 37

# TABLE OF AUTHORITIES

**Cases**

Claiborne v. United States, No. 06-5618 ........................ 34

Davis v. Alaska, 415 U.S. 308 (1974) ........................... 29

Delaware v. Van Arsdall, 475 U.S. 673 (1986) .................. 29

Giglio v. United States, 405 U.S 150 (1972) ................... 27

Olden v. Kentucky, 488 U.S. 227 (1988) ........................ 29

Quercia v. United States, 289 U.S. 466 (1933) ................ 19

Rita v. United States, No. 06-5754 ............................ 34

Silva v. Brown, 416 F.3d 980 (9th Cir. 2005) ................... 28

Spalitto v. United States, 39 F.2d 782 (8th Cir. 1930) ........ 20

United States v. Amlani, 111 F.3d 705 (9th Cir. 1997) ......... 15

United States v. Bauer, 132 F.3d 504 (9th Cir. 1997) .......... 31

United States v. Bensimon, 172 F.3d 1121 (9th Cir. 1999) ....... 30

United States v. Booker, 125 S.Ct. 738  (2005) ............... 32

United States v. Cantrell, 433 F.3d 1269 (9th Cir. 2006) ....... 34

United States v. Carty, 453 F.3d 1214 (9th Cir. 2006), petition for rehearing en banc granted .............................. 34

United States v. Cruz-Garcia, 344 F.3d 951 (9th Cir. 2003) ..... 31

United States v. Green, 648 F.2d 587 (9th Cir. 1981) ........... 30

United States v. Koon, 34 F.3d 1416 (9th Cir. 1994) ............ 25

United States v. Leon-Reyes, 177 F.3d 816 (9th Cir. 1999) ...... 25

United States v. Lindstrom, 698 F.2d 1154 (11th Cir. 1983) .... 27

United States v. Manning, 56 F.3d 1188 (9th Cir. 1995) ........ 15

United States v. McCracken, 488 F.2d 406 (5th Cir. 1974) ...... 20

United States v. Mendoza-Prado, 314 F.3d 1099 (9th Cir. 2002) .. 31

United States v. Menyweather, 431 F.3d 692 (9th Cir. 2005) .... 34

United States v. Miguel, 111 F.3d 666 (9th Cir. 1997) ......... 15

United States v. Monaghan, 239 U.S. App. D.C. 275, 741 F.2d 1434
(D.C. Cir. 1984), rev'd on other grounds by 518 U.S. 81 (1996)
....................................................... 25

United States v. Partin, 493 F.2d 750 (5th Cir. 1974) ......... 28

United States v. Shabani, 48 F.3d 401 (9th Cir. 1995) ......... 30

United States v. Shipsey, 363 F.3d 962 (9th Cir. 2004) ......... 14

United States v. Shryock, 342 F.3d 948 (9th Cir. 2003), cert.
denied, 124 S. Ct. 1729 (2004) .............................. 15

United States v. Smith, 77 F.3d 511 (D.C. Cir. 1996) .......... 28

United States v.  Williams, 473 F.2d 507 (5th Cir. 1973) ...... 20

United States v. Zavala, 443 F.3d 1165 (9th Cir. 2006), petition
for rehearing en banc granted ............................... 34

Viereck v. United States, 318 U.S. 236 (1943) ................ 25

Williams v. United States, 93 F.2d 685 (9th Cir. 1937) .... 19, 20

**Statutes**

18 U.S.C. § 152(1) ............................................. 2

18 U.S.C. § 3553(a) ........................................... 32

26 U.S.C. § 7203 .............................................. 2

**Rules**

Fed. R. App. P. 4(b) .......................................... 1

# I. JURISDICTION AND TIMELINESS

This is an appeal from the judgment and commitment order issued by the district court on June 14, 2006. E.R. 169. The district court pronounced sentence on May 31, 2006. Appellant filed a timely notice of appeal on June 2, 2006. E.R. 177. See Fed. R. App. P. 4(b).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

# II. CUSTODY STATUS

Appellant Sharon Caulder is released on bond pending appeal.

# III. ISSUES PRESENTED FOR REVIEW

1.  Did the district court abuse its discretion in providing argumentative instructions regarding bankruptcy law which emphasized the prosecution theory of the case?

2.  Did the district court err in refusing to release the psychiatric records of one of the government's primary witnesses, which records are filed under seal and in camera with the district court?

3.  Did the district court err in limiting the cross-examination on the mental state of a government witness with a history of psychiatric disorders?

1

4.   Did the district court impose an unreasonable sentence,
because the Court failed to consider the parsimony principle or
apparently, any factor other than the advisory sentencing
guidelines?

# IV. STATEMENT OF THE CASE

On January 29, 2004, a federal grand jury sitting in the
Northern District of California returned an indictment against
defendant Sharon Lee Caulder. On April 14, 2005, a federal grand
jury sitting in the Northern District of California returned a
multi-count superseding indictment against Ms. Caulder.  E.R. 1.

Count 1 alleged that on or about or between December 30, 1998,
and April 8, 1999, the defendant knowingly and fraudulently
concealed from creditors and United States trustee an asset of
her bankruptcy estate, namely her ownership and interest in Bank
of America account number 06272-08907, in violation of 18 U.S.C.
§ 152(1).  E.R. 1.  Count 2 alleged a second violation of id., §
152(1) by failing to disclose in the same bankruptcy case the
defendant's ownership and interest in Bank of America account
number 06275-07383.  E.R. 2.  Counts 3 and 4 alleged additional
counts of bankruptcy fraud, based on Ms. Caulder's concealment of
her ownership in interest in Bank of America accounts numbers
06276-08905 and 06273-04488.  E.R. 2-3.  Counts 5-10 alleged that
for the tax years 1998, 1999, 2000, 2001, 2002, and 2003, Ms.
Caulder willfully failed to file a tax return as required by law,

in violation of 26 U.S.C. § 7203.  E.R. 4-6.  Each count alleged
that for each tax year involved Ms. Caulder earned over the
minimum gross income required to trigger the duty to file an
income tax return.[1]  E.R. 4-6.

On November 14, 2005, the government moved to dismiss counts
1 and 2 of the superseding indictment.  The parties agreed that
counts 3-9 of the indictment be renumbered as counts 1-7.

The district court held a jury trial from November 14, 2006,
through November 18, 2006.  On November 18, 2006, the jury
convicted Ms. Caulder of all counts.

On May 31, 2006, the district court sentenced Ms. Caulder to
30 months' imprisonment.  The court imposed $129,657.22 in
restitution, a $325 special assessment, and three years of
supervised release. Ms. Caulder filed a timely notice of appeal.

## Statement of Facts

### 1. The Bankruptcy Fraud Case and Evidence of Expenditures.

Prior to 1997, Sharon Caulder had been receiving disability
payments from the Equitable Life Insurance Company.  In 1997, the
Equitable obtained a default judgment against Ms. Caulder in the
total amount of $187,158.  On December 30, 1998, she filed a
personal bankruptcy petition.  E.R. 68-70.  Both Ms. Caulder and
her lawyer, Claude Ames, signed the petition six months earlier,
on July 30, 1998.  Id.

---

1 The tax offenses are misdemeanors.

3

As part of her bankruptcy petition, Ms. Caulder submitted
schedules of personal and real property, creditors, and exempt
property.  Her schedule of assets stated that she had no
checking, savings, or other financial accounts.  RT 291.  She
listed her monthly income as $1950.  RT 294.  On the schedule for
exempt property, Ms. Caulder listed household goods and
furnishings, wearing apparel, and a 1991 Jeep Cherokee. RT 292.
She listed her current monthly expenditures as $2220.  Id.  Her
total assets were valued at $3,020.  Exh. 11C.  Ms. Caulder
signed the petition under penalty of perjury.  RT 329; E.R. 70.

The bankruptcy court held a 341 creditors' meeting on
February 2, 1999.  The government introduced a tape of the
meeting into evidence, despite its poor quality.  RT 298-99, 306.
Ms. Caulder, her bankruptcy attorney Claude Ames, and the
trustee, Richard Spear, were present at and participated in the
meeting.  RT 308-09.  The tape revealed that, at one point, Mr.
Ames said that he would amend the income schedules.  Such an
amendment was never filed, rather, the only amended schedule
filed was a schedule of creditors which showed additional debt.
Exh. 11Q1.

Ultimately, the bankruptcy court treated the case as a no-
asset case.  The trustee did not receive any property or pay any
money on the bankruptcy estate's behalf.  RT 304. The bankruptcy
court discharged Ms. Caulder's debts on April 9, 1999.  The final
bankruptcy decree issued on April 13, 1999.  RT 309.

Minnie Loo, the assistant United States Trustee for the
Oakland Division of the United States Bankruptcy Court, testified
that between 1998 and 1999, there was no audit procedure in place
for the review of bankruptcy documents filed by debtors.  There
were more than 9000 chapter 7 cases filed in 1998 in Oakland
alone.  RT 310.  Ms. Loo asserted that the fundamental principle
of bankruptcy relief required debtors to disclose everything they
owned and everything they owed.  RT 311.

Ms. Loo acknowledged that a debtor was entitled to keep up
to $15,800 worth of property as exempt.  RT 323.  Ms. Caulder
claimed about $2,900 worth of exempt property and would have been
entitled to claim an additional $12,900.  RT 324-25.  Ms. Loo
asserted, however, that if property was not disclosed, the debtor
could lose the exemption.  Id.  In such a situation, the
bankruptcy court would decide whether the exemption remained
valid.  RT 325.

The government presented evidence that on December 30, 1998,
Ms. Caulder had two bank accounts at the Bank of America,
checking account number 06276-089-05, and savings account, number
0273-0448.  On December 30, 1998, the balance of the checking
account was $150 and the balance of the savings account was
$68,622.86.  RT 340.  However, on July 30, 1998, the date the
petition was signed, Ms. Caulder's account balance was $3609.19.
RT 339; Exh. 6b3.  The bank accounts were not listed on the
bankruptcy schedules, despite the fact that Ms. Caulder wrote a

$500 check on one account to pay her bankruptcy attorney.  The government also presented evidence that on the same day, Ms. Caulder owned a horse named Cherokee who was then valued at about $3000.  RT 363.  Ms. Caulder did not disclose the existence of this horse.

The government presented evidence that shortly after her bankruptcy discharge, Ms. Caulder made a number of large purchases.  On April 20, 1999, she purchased a house in the Oakland hills for $386,356.28 in cash.  RT 358-60, Exh. 12-1-5. The government also showed that on April 9, 1999, Ms. Caulder possessed a savings account at the Bank of America with a balance of $448,811.92.  RT 340.  On April 22, 1999, Ms. Caulder's checking account contained $32,521.40.  Id.  The same day, her savings account contained $105,431.30.  Id.  Her average daily balance was $198,533.47 between January 20 and January 25, 1999. RT 341.  During that time, however, she also had two insufficient funds fees deducted from her account.  RT 349-50.

The parties stipulated regarding additional expenditures. In September 1999, Ms. Caulder purchased a German Warmblood horse known as Moose for $25,000.  RT 625.  On September 9, 1999, Ms. Caulder opened a brokerage account by depositing a $44,444 check which she had received from de la Cruz.  RT 660.  She purchased a second horse known as Moonlight Girl in October 2000 for approximately $30,000.  RT 628.  The parties stipulated that from November 2000 through June 2001, Ms. Caulder paid $5,085 for

6

horse training.  She paid another $2400 to board three horses
from November through December, 2000.  From January through June
2001, she paid $6,400 to board two horses. RT 630-31.  On
February 6, 2001, Ms. Caulder purchased a 1999 Mercedes-Benz for
$39,868.60.  This purchase was completed using two cash payments.
RT 633.  On February 27, 2001, Ms. Caulder purchased a
condominium in Hawaii for $165,000.  RT 641.  The parties
stipulated that Ms. Caulder purchased 822 N. Rampart St, New
Orleans, Louisiana, in August 2003, for $670,000.  RT 659-61.

The government also introduced Ms. Caulder's
representations, made on a 2003 loan application, which stated
that her monthly income was $16,386.  RT 657.  Her listed assets
included real estate worth $865,000, an investment account worth
$35,000, and two vehicles with a total value of $47,000.  She
listed her net worth as $1.2 million.  RT 658.  Additionally, in
February 2001, Ms. Caulder represented on a credit application
(completed in connection to the Mercedes purchase), that her
gross monthly income was $20,000.  RT 632.

## 2. Failure to File

The parties stipulated that Ms. Caulder did not file tax
returns from 1998-2003.  RT 381-82. The government presented the
IRS's courtroom witness coordinator who searched the IRS database
for records relating to Ms. Caulder.  He found no evidence that
she had filed returns for 1985, 1986, and 1993.  RT 381-82.  Ms.
Caulder had filed tax returns for tax years 1972-75.  RT 384-95.

7

The government then presented evidence that Ms. Caulder received funds exceeding the minimum gross amount which triggered the duty to file a tax return during the tax years 1998-2003, but that she failed to file a tax return for any of these years.

The evidence showed that for 1998, Ms. Caulder received monies totaling approximately $138,968. RT 685. The amount required to trigger the duty to file an income tax return was $6,950. RT 685. In 1999, Ms. Caulder received monies totaling $830,391. Id. In 2000, she received $247,677. Id. In 2001, Ms. Caulder received approximately $300,000. Id. Finally, in 2002, Ms. Caulder received approximately $188,992. Id. For the years 1999-2002, the minimum gross income that triggered the duty to file a return was $7,050, $7,200, $7,450, and $7,700, respectively. Id.

### 3. Evidence Regarding Payment for Services Rendered.

Witnesses who paid Ms. Caulder for healing services testified at trial. Most of these witnesses testified regarding the payment of relatively modest sums of money. For example, Lisa Fernandez testified that in 1998 she began participating in one of Ms. Caulder's classes and went on to have one-on-one sessions with Ms. Caulder. Between March and December of 1998, Ms. Fernandez paid Ms. Caulder $1210. RT 415. Fernandez's then husband, Erik Frankwich, also saw Ms. Caulder and paid her a total of $2400 in 1998. RT 432.

8

The government's star witness, and the person who had
provided Ms. Caulder with the vast majority of the money she
received from 1998-2003, was Michael de la Cruz. De la Cruz, who
paid Ms. Caulder approximately $1.6 million over five years, was
a dissatisfied customer who had sought to have her prosecuted for
fraud. RT 455. De la Cruz's testimony was significant, because
he provided Ms. Caulder with the bulk of the money she received;
without his testimony, the amount of unreported income was
logarithmically smaller.

De la Cruz first met with Ms. Caulder at the end of June
1998, when he traveled to California from Cambridge,
Massachusetts. He intended to leave after one week and two or
three sessions. RT 451. Instead, he remained in California and
continue to receive treatments from Ms. Caulder. RT 452.
Originally, he saw her daily, than twice a day, and then seven
days per week. RT 453. De la Cruz asserted that he paid Ms.
Caulder because she threatened him with a horrible fate if he did
not continue treatment with her. RT 455. De la Cruz asserted
that Ms. Caulder tortured him and used coercive tactics to obtain
higher payments from him. Id.

De la Cruz claimed that Ms. Caulder told him he was in
terrible shape and that his life was at risk when he first began
receiving treatments from her in 1998. RT 455-56. He asserted
that at the beginning of January 1999, Ms. Caulder demanded
payment of $2 million, partly as punishment for his decision to

consult another healer.  RT 467. He lacked the $2 million in a
lump sum and suggested that he make payments, designate the
payments as gifts and he would pay the tax on the payments.  RT
468-71.  De la Cruz drafted a proposed payment schedule in a
letter.  RT 492.  Exhibit 27, the schedule, indicated that
$148,500, had been provided to Ms. Caulder before entering into
the agreement, which was dated January 3, 1999.  RT 493.

De la Cruz consulted his tax accountant in January 1999 to
find out whether there was a way to transfer his income to
Caulder to give her the largest amount of money possible toward
the $2 million target.  RT 563.  His accountant explained that if
the money were gifted to Caulder, that would reduce the taxes she
had to pay.  RT 564.  De la Cruz wrote to Ms. Caulder that he
would give her the after-tax equivalent of over $1 million.  RT
566.  He, in turn, would pay the taxes on the gifts.  RT 470,
494-95.

De la Cruz testified that for 1999, the maximum amount that
could be gifted was $625,000.  He intended to gift this amount of
money to Ms. Caulder.  RT 495, 524.  De la Cruz wrote his first
1999 check to Ms. Caulder on January 15, 1999.  RT 470.  The
check was for $200,000.  Id.  On this check, he wrote "tax free
gift section 706," in the bottom left hand corner of the check.
RT 470.  De la Cruz testified that he actually meant to refer to
IRS Code section 709, which covers gifts.  RT 471.  Thereafter,
de la Cruz paid approximately $50,000 per month, then $44,444 per

10

month.  RT 494.  Many, if not most of the checks, contained
notations such as "gift," "tax-free," or "section 706."  RT 469-
70, 571-73.  At trial, de la Cruz attempted to disclaim his
intent to gift Ms. Caulder, testifying that he had made payments
under duress and that he wrote things like "gift" and "tax-free"
because he had panicked.  RT 567.  At trial, he took the position
that the payments were not gifts, but were payments made under
duress.  RT 568.

    However, Exhibit 27 provided that $625,000 of the amount
paid beginning January 15, 1999 would be paid tax-free to Caulder
under "federal exclusion 706."  RT 495.  De la Cruz believed that
Caulder would not have to pay taxes on money designated as gifts.
 RT 602-03.  De la Cruz claimed that, occasionally when he gave
Ms. Caulder a check, he would say, "here's your gift."  She would
reply that "this was payment for saving" his life.  RT 473.

    Ultimately, de la Cruz did not pay the gift taxes.  He
claimed that he did not file the necessary gift tax form, because
Ms. Caulder did not provide him with her Social Security number
and address. RT 475. He testified that he asked Caulder for her
social security number and address in order to complete the form,
but she refused to accept his registered letter containing the
request.  RT 475-78.

    De la Cruz testified that he did not get better after 1999,
and he continued to see Ms. Caulder.  RT 494.  He entered into a
second contract for approximately $600,000.  Id.  He began paying

11

Ms. Caulder in cash, allegedly at her suggestion.  RT 499.  He
testified that he gave her approximately $152,000 in cash.  Id.

De la Cruz was impeached with evidence of prior inconsistent
statements, including the gift notations on many of his checks.
He had written numerous thank you letters to Ms. Caulder.  RT
538-39.  At trial, he asserted that the thank you letters were
part of the torture.  Id.  In 2003, de la Cruz stopped seeing Ms.
Caulder.  RT 596.  Shortly thereafter, he contacted the FBI,
claimed that she defrauded him of $1.7 million, and sought the
FBI's assistance in getting his money back.  RT 528.   Among
other things, he claimed that Ms. Caulder was in the process of
liquidating her assets and squandering money.  Id.  He later
urged the FBI to attach Ms. Caulder's property in California,
Hawaii, and Louisiana.  RT 531.  De la Cruz admitted he was
looking for a way to get money back from her based on his fraud
claim.  RT 532.  He ultimately recorded payments he made to Ms.
Caulder as a theft loss on his tax returns in the amount of $1.1
million.  RT 533.  As of the time of trial, he had received about
$300,000 from the federal government in tax credits.  RT 534.

De la Cruz denied falsely claiming that Ms. Caulder tortured
and abused him: he asserted at trial that she did torture him.
He suspected she had drugged him through food and water and
brainwashed him through hypnosis.  RT 537.  He claimed that he
had been diagnosed as being partially crippled in his right ankle
and that this condition hade been caused by Caulder's "torture."

12

RT 537.   He accused Ms. Caulder of manipulating his suicidal
tendencies, and making him beg and humble himself for her
treatment.   Id.   De la Cruz also accused Ms. Caulder of causing
him to suffer from panic attacks.   RT 582.

De la Cruz admitted he was angry with Caulder.   RT 548.   He
also admitted that when he contacted Caulder he was suffering
from depression and nightmares.   RT 554.   He had been attending a
spiritual healing school operating out of a hotel in New York and
began to believe there was a problem with the school.   RT 556.
He contacted Ms. Caulder, because he had heard she too had a
problem with the school.   RT 557.

## 4. The Defense Case

The defense presented a good faith defense and attempted to
raise a reasonable doubt that Ms. Caulder possessed the requisite
intent for guilt.   Along these lines, the defense vigorously
impeached the testimony of Michael de la Cruz.   Because de la
Cruz identified many of his checks to Ms. Caulder as tax-
deductible gifts, and because of their agreement, the defense
contended that Ms. Caulder legitimately could have believed that
the money she received from de la Cruz were tax-free gifts and
not realized that selects similar she needed to file tax returns.
See RT 760-62.   This was particularly true, because the monies
she received from other person were relatively small and might
not have alerted Ms. Caulder as to the need to file tax returns.

The defense strongly argued that Ms. Caulder was not guilty

of bankruptcy fraud, because she had signed the bankruptcy petition long before it was filed and that at that time, she had minimal assets.  RT 756.  For example, on July 30, 1998, when she signed the bankruptcy petition, Ms. Caulder's bank balance in her Bank of America account was $3609.19.  RT 757.  This amount of money would have been exempt under bankruptcy law.  RT 324-25. Similarly, the horse Cherokee, which Ms. Caulder did not declare as an asset, was only worth $3,000.  This horse, too, could have been exempted from distribution as part of the personal property exemption.  RT 324-25.

The defense also pointed out that Ms. Caulder had a history of financial mismanagement.  She frequently paid overdraft fees despite having sufficient funds to pay outstanding checks.  E.g. RT 759, 762-63.  She got behind on her taxes in the 1990s and went to see John Godino, who owned a tax preparation business. RT 397-401.  He prepared at least one tax return for her, but did not file it. He did the work necessary to catch her up on her taxes.  RT 405.   Ms. Caulder contacted him in 2003, and asked him to verify her income.  RT 402.  At that time, she told him she had gotten behind on her taxes again.  RT 402-03.

## VI. STANDARD OF REVIEW

This Court reviews the district court's formulation of jury instructions for abuse of discretion.  United States v. Shipsey, 363 F.3d 962, 966 n.3 (9th Cir. 2004).

14

This Court reviews de novo a district court's interpretation of the Federal Rules of Evidence. United States v. Manning, 56 F.3d 1188, 1196 (9th Cir. 1995). Whether limitations on cross-examination violated the Confrontation Clause is reviewed de novo. United States v. Amlani, 111 F.3d 705, 716 (9th Cir. 1997). A Confrontation Clause violation requires reversal unless the government can demonstrate it is harmless beyond a reasonable doubt. United States v. Miguel, 111 F.3d 666, 671-72 (9th Cir. 1997). This Court reviews a court's restriction of cross-examination that does not infringe on the Sixth Amendment for abuse of discretion. United States v. Shryock, 342 F.3d 948, 980 (9th Cir. 2003), cert. denied, 124 S. Ct. 1729 (2004).

## VII. SUMMARY OF ARGUMENT

Appellant Sharon Caulder did not receive a fair trial, because the jury instructions on bankruptcy fraud biased the jury in favor of conviction. The instructions were unfairly argumentative and urged conviction on matters irrelevant to the charged offense. The court further prejudiced Ms. Caulder's defense by unfairly restricting cross-examination of the government's primary witness on questions of bias and competency. This Court should reverse appellant's convictions.

# VIII.  ARGUMENT

## A.  THE DISTRICT COURT ERRED WHEN IT PROVIDED JURY INSTRUCTIONS DESCRIBING BANKRUPTCY LAW IN A MANNER THAT EFFECTIVELY DIRECTED A VERDICT FOR THE GOVERNMENT.

### *1. Background*

Over defense objection and prior to the commencement of the case, the district court read a lengthy series of instructions to the jury regarding bankruptcy and bankruptcy law.  See E.R. 40-46, 48-56, 61-64.  While part of the instructions merely provided an introduction to the nature of bankruptcy, e.g., E.R. 101-03, sections of the instructions were highly argumentative in favor of the government.  The instructions emphasized the prosecution's case, were not fair and impartial, and prejudiced the jury against the defense.  The instructions, which purported to provide the principles of bankruptcy law, conflicted with the final instructions given regarding the good faith defense and injected irrelevant material into the case.  For these reasons, this Court should reverse Ms. Caulder's bankruptcy fraud conviction.  A copy of the court's instructions are included in the excerpts of record, along with the government's submission

which highlights the portions to which the defense objected.
E.R. 47-56, 101-10.[2]

The instructions began with an introduction to bankruptcy law. E.R. 101-03. The court went on to state, however, that in bankruptcy, "the debtor has an <u>absolute</u> duty to file complete and accurate schedules." E.R. 104 (emphasis added). The court continued:

> The debtor is required to file these under penalty of perjury. The debtor may amend these forms or schedules at any time to make them accurate, and has an ongoing duty to ensure that his or her file is accurate. Even if a bankruptcy lawyer helps the debtor to file, the debtor is responsible for the accuracy of the information in his or her schedules and statements.
>
> In the schedule of assets, the debtor is required to disclose the existence of any assets belonging to the debtor. A bank account that belongs to the debtor is an asset of the debtor. **The debtor must disclose an asset even if the debtor believes that the asset may ultimately be exempt from creditors. The Bankruptcy Court makes the final determination as to whether property can be used to satisfy the debtor's debts.**

<u>Id</u>.

        *    *    *

The court provided additional objectionable instructions, to wit:

> **A debtor cannot fail to disclose an asset because he or she believes it may be exempt**. One of the schedules that the debtor must file is a schedule of exempt property. However, this is only a schedule of property that the debtor claims is exempt.
>
> A trustee or creditor or any party with an interest, may object to the debtor's attempt to claim certain

---

2 The sections of the jury instructions to which the defense objected are in bold-face type. E.R. 47-56. The defense submission is contained in the Excerpts at 40-46.

property as exempt.  Whether certain property in a
particular case is exempt, is not always clear under
the law.  And if there is a dispute, it is the job of
the bankruptcy judge to make the ultimate decision
about whether property as exempt.

**If the debtor intentionally or fraudulently failed to
disclose an asset, the debtor may lose the right to
claim that property is exempt.  The debtor's bankruptcy
case may even be reopened and he or she may lose
previously granted discharge if it is later discovered
that the debtor's petition, schedules, or statements
contain intentional or fraudulent omissions or
misstatements relating to an asset if the omission or
misstatement detrimentally effects [sic] the
administration of the estate.  This can happen even if
the omitted asset is of little value or would not be
property of the estate.**

E.R. 106-07.

The court further instructed, over defense objection:

Approximately 20 to 40 days after a bankruptcy
petition is filed, the trustee holds what is called a
341 creditors meeting, or simply a 341 meeting.  **In
order to preserve their independent judgment,
bankruptcy judges are prohibited from attending this
meeting.**  The debtor must attend the meeting.

The purpose of the meeting is to allow creditors
and the trustee to question the debtor about his or her
financial affairs and property under oath.  The scope
of the examination is quite broad and may relate to the
acts, conduct or property or to the liabilities and
financial condition of the debtor, or to any matter
which may affect the administration of the debtor's a
state where the debtor's right to a discharge.

**The debtor is required to cooperate and provide
any financial records or documents asked.  The debtor
is required to fully and honestly disclose all aspects
of his or her financial condition as of the date of the
bankruptcy filing.  The debtor is required to do this
in his or her bankruptcy schedules and at the 341
creditors meeting.**

18

> **The bankruptcy court must determine what, if any,
> assets can be used to satisfy the creditors' claims.
> Without accurate information from the debtor, the
> bankruptcy court cannot make these decisions.    The
> bankruptcy system depends on full and voluntary
> disclosure by debtors.    In 1998, 9,366 Chapter 7
> bankruptcy cases were filed with the Oakland Division
> of the United States bankruptcy court, alone.    If,
> based on the debtor's petition, schedules, and
> testimony at the 341 creditors meeting, the trustee
> determines that the debtor has no assets beyond what is
> lawfully exempted and other conditions are met, the
> debtor's debts will typically be discharged.**

E.R. 108-109.

These instructions improperly argued the government's case,
contained irrelevant and prejudicial information, and urged an
inference unsupported by the evidence.

## 2.  The District Court's Instructions Were Unduly Argumentative, Displayed Judicial Bias In Favor Of The Prosecution, And Directed The Jury To Consider Irrelevant And Prejudicial Matters.

In a jury trial, a federal judge serves as the governor of
the trial to assure its proper conduct and to determine questions
of law.   Quercia v. United States, 289 U.S. 466, 469 (1933).
District judges should avoid all appearance of advocacy as to
questions which should be submitted to the jury.   Williams v.
United States, 93 F.2d 685, 692 (9th Cir. 1937).

Because the court must be perceived as neutral, the jury
instructions given by the judge should not be unduly
argumentative in favor of the prosecution's view or the defense
view nor should the instructions emphasize a particular legal or
factual point.   Jury instructions should provide a succinct

19

statement of the law, including general principles of criminal law, the elements of the offense, and the defense theory. United States v. McCracken, 488 F.2d 406, 414 (5th Cir. 1974). Argumentative language in jury instructions poses a serious risk that the judge will be perceived as a second advocate for the government and that the jury will be impressed that the court desires a conviction. Spalitto v. United States, 39 F.2d 782, 788 (8th Cir. 1930). Indeed, argumentative jury instructions present the same problem as judicial commentary on the evidence. See United States v.  Williams, 473 F.2d 507, 511-12 (5th Cir. 1973); Williams v. United States, 93 F.2d 685, 690-92 (9th Cir. 1937).

Here, the district court provided instructions that were overly argumentative in favor of the government's view of the evidence.  The instructions unduly emphasized the responsibility of the debtor, characterizing that responsibility as "absolute." The instructions also urged the jury to convict on an impermissible basis, that Ms. Caulder's omission of information from her bankruptcy petition threatened the bankruptcy system. Finally, the instructions created an invalid inference, that the volume of business at the bankruptcy court showed that Ms. Caulder possessed the requisite intent to defraud.

The instructions' first prejudicial flaw was their undue emphasis on the debtor's absolute duty of full, complete, and truthful disclosure, including the disclosure of property

believed to be exempt.  The instructions mentioned "absolute duty" several times during the recitation.  E.R. 104, 106-07 (discussion of duty to disclose property believed to be exempt); 108.  These instructions improperly emphasized the prosecution's theory of guilt, that there was no excuse for Ms. Caulder's failure to list two bank accounts and a horse on her bankruptcy petition, and therefore, that these omissions were made with the intent to defraud.  Furthermore, the instruction that a debtor must disclose an asset even if the debtor believes that such an asset may be exempt, advises that a debtor is guilty of bankruptcy fraud even if she mistakenly failed to disclose the asset or did not disclose it because of a good faith belief that the asset or property was exempt.

Notably, the instruction regarding an absolute duty was both prejudicial and unnecessary.  The bankruptcy petition itself was required to be signed under penalty of perjury. That information is sufficient to inform the jury of the duty of truthfulness and completeness.  The jury should have been allowed to decide whether Ms. Caulder acted in good faith in failing to disclose the bank accounts or whether she inadvertently failed to mention them because they were so small as of the date she signed the petition.

The district court's instruction on the debtor's duty to disclose contradicted and undermined subsequent instructions about the good faith defense.  The court instructed:

21

The good faith of the defendant is a complete defense to the bankruptcy charges in counts 1 and 2 of the indictment, because good faith on the part of the defendant is simply inconsistent with the intent to defraud alleged in those charges.

A person who acts or causes another to act on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong.  An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct.

A defendant does not act in good faith if, even though she honestly holds a certain opinion or belief, that defendant also knowingly makes false or fraudulent pretenses or representations to others.

The law is written to subject to criminal punishment only – to subject to criminal punishment only those people who knowingly defraud or attempt to defraud.

E.R. 124.  The court also instructed that the government bore the burden of proving the elements of the crime, including intent to defraud, beyond a reasonable doubt.  These instructions were seriously undermined by the previously given instructions on bankruptcy law.

The repeated exhortations about the debtor's absolute duty to disclose conflicted with the good faith instruction. Indeed, the instructions implied a standard of strict liability.   While the statement that a debtor has an absolute duty to disclose all property may be true from the point of view of the bankruptcy court, when given in conjunction with the instruction on good faith, the statement was confusing and contradictory.  If debtor has an absolute duty to disclose, then by definition, she cannot

22

act in good faith in failing to disclose property. The
instructions virtually provided a standard of strict liability
under which a defendant is criminally liable for any mistake.

The instructions regarding exempt property also conflicted
with the good faith instructions.  It was reasonable for the
defense to argue to argue that the defendant acted in good faith,
because much of the undeclared property either was not owned at
the time she apparently signed the petition or would have been
exempt.  The court's instructions that the debtor has an absolute
duty to disclose all exempt property directly contradicted the
instruction on the good faith defense.

More important, the good faith and intent instructions did
not cure the earlier emphasis on an absolute duty to file
complete and truthful schedules, which failed to mention good
faith, mistake or intent.  It is difficult to conceive how, on
the one hand, a debtor has an absolute duty to file complete and
truthful schedules, while on the other, there is a defense of a
good faith belief in accuracy.  The earlier instructions
virtually directed a verdict, given the fact that Ms. Caulder did
not disclose the existence of the horse Cherokee, and $3,609 in a
bank account at the time of signing.  Of course, both the horse
and the $3600 could have been exempt.  Moreover, by instructing
that all exempt property had to be declared, regardless of the
debtor's belief, the court negated the possibility of a good
faith failure to list property based on a belief in exemption.

## 3. *The Jury Instructions Urged Conviction Based on an Inference Not Supported by the Evidence.*

The jury instructions regarding the number of bankruptcy petitions filed in Oakland in 1998 improperly urged conviction based on an inference not supported by the evidence. The instructions told the jury that the failure to make a complete and truthful disclosure in a bankruptcy petition and schedules threatened the bankruptcy system which "depends" upon such a disclosure.  E.R. 108.  The court emphasized this point when the court instructed the jury about the number of bankruptcy petitions filed in the Oakland Division in 1998.  E.R. 108-09. The number of bankruptcy petitions filed in Oakland was not relevant to the elements of bankruptcy  fraud.  At best, the number of personal bankruptcy petitions could have been relevant only if the government had shown Ms. Caulder knew of the number of petitions filed.  Such evidence might have allowed an inference that Ms. Caulder acted to deceive, believing she would not be caught because of the number of bankruptcy petitions. But, there was no evidence Ms. Caulder knew how many bankruptcy petitions were filed annually or at all.

The court's instructions a discharge of debts would occur if "based on the petition, schedules and testimony at the 341 creditors meeting, the trustee determines that the debtor has no assets beyond what is lawfully exempted," told the jury that it was easy to cheat the bankruptcy system.  This message was

24

strengthened by the court's instructions regarding the large number of bankruptcy petitions filed in Oakland in 1998. These instructions informed the jury the bankruptcy fraud was a serious evil and easy to commit. Whether true or not, such a statement is irrelevant to the fundamental question whether Ms. Caulder was guilty of bankruptcy fraud. The instructions amounted to a judicial comment on the importance of honesty in the bankruptcy system. The instructions thus urged conviction on the basis that the law violated was important.

Notably, prosecutors are forbidden from making comments "calculated to arouse the passions or prejudices of the jury." United States v. Leon-Reyes, 177 F.3d 816, 822 (9th Cir. 1999); Viereck v. United States, 318 U.S. 236, 247-48 (1943). This fundamental principle bars prosecutors from urging conviction to "protect community values, preserve civil order, or deter future lawbreaking." United States v. Koon, 34 F.3d 1416, 1443 (9th Cir. 1994)(quoting United States v. Monaghan, 239 U.S. App. D.C. 275, 741 F.2d 1434, 1441 (D.C. Cir. 1984), rev'd on other grounds by 518 U.S. 81 (1996)). In a bankruptcy case like this one, the prosecutor would not have been permitted to argue that conviction was appropriate, because, among other things, the defendant's conduct threatened the viability of the bankruptcy system, which lacked the means to catch cheaters. Nor could the prosecutor have presented arguments regarding the importance of the bankruptcy system to free-market capitalism.

The district court is equally precluded from presenting
instructions that suggest conviction is appropriate for an
impermissible basis.  The instructions suggested that conviction
was appropriate, not based on the evidence, but because any
misstatements were harmful to the bankruptcy system.  Because the
instructions improperly emphasized harm to the bankruptcy system,
this Court page down to save document should reverse the
bankruptcy fraud conviction.

### 4. The Error Was Not Harmless.

The error was not harmless because the recitation of
bankruptcy law undermined the later given instructions regarding
the government's burden of proof in the elements of the offense.
 The instructions on bankruptcy law, at a minimum, provided the
court's sanction on the government's theory of guilt.

The timing of the instructions heightened the prejudice.
The jury received not only an opening statement from the
government, but a lengthy dissertation on the law which invited
pre-judgment of the facts in favor of the prosecution.  As the
prosecution presented its evidence, the jury could note the
portions of bankruptcy law with which Ms. Caulder had not
complied.  But these portions of bankruptcy law are not the
elements by which criminal liability is judged.  Rather, the
elements of liability are the elements of the offense.  The
court's later provision of correct instructions on the elements
of the offense did not ameliorate the harm caused.  For these

26

reasons, this Court should reverse Ms. Caulder's bankruptcy fraud conviction.

## B. THE DISTRICT COURT ERRED IN DECLINING TO DISCLOSE THE PSYCHIATRIC RECORDS OF GOVERNMENT WITNESS MICHAEL DE LA CRUZ, WHEN DE LA CRUZ WAS THE PRIMARY WITNESS AGAINST APPELLANT CAULDER.

Prior to trial, the defense attempted to subpoena the psychiatric records of Michael de la Cruz, for use in cross-examination if appropriate. See Giglio v. United States, 405 U.S 150 (1972). The court issued subpoenas to Dr. Victor Bernstein and Michael de la Cruz for de la Cruz's mental health records, but directed that the records be produced only to the court for in camera review.[3]  E.R. 22. After reviewing the records, the court ruled that the records did not support a claim that Michael de la Cruz was incompetent to testify nor "any information that should be disclosed to the parties." E.R. 32-33. The records remain under seal with the district court.

The defendant has the right to attempt to challenge a witness' credibility with competent or relevant evidence of a mental defect or illness, or history of mental treatment occurring at a time related to the time period about which the witness is testifying. United States v. Lindstrom, 698 F.2d 1154, 1164-67 (11th Cir. 1983); United States v. Partin, 493 F.2d

---

3 When the defense moved for issuance of the subpoenas, the government opposed and moved to quash. The court issued the

27

750, 763 (5th Cir. 1974).  Evidence of a history of mental
illness, including depression, has been recognized to be material
to a witness' credibility.  Silva v. Brown, 416 F.3d 980, 986
(9th Cir. 2005); United States v. Smith, 77 F.3d 511, 516 (D.C.
Cir. 1996).  Evidence of mental illness is relevant when it may
reasonably cast doubt on the ability or willingness of a witness
to tell the truth.  Id.  The evidence need not show that the
witness is incompetent.

     The district court reviewed de la Cruz's mental health
records in camera and determined that they should not be
disclosed.  Appellant requests this Court to conduct a similar in
camara to independently evaluate whether the records contained
valuable impeachment material. Given the court's emphasis on
competency, the district court may well have improperly withheld
records that would have been useful for the impeachment even
though such records may not have proven witness incompetence.

     De la Cruz's credibility was a central issue in the case.
His testimony regarding the nature of the payments and the
services he received from Ms. Caulder were very important to the
government's case.  Yet, the defense lacked a critical tool for
cross-examination, evidence that he suffered from grave mental
disorders, and had been hospitalized for mental illness within
one year before he met Ms. Caulder.  If the records contained
evidence of delusions, cognitive difficulties, or any other

---

subpoenas, but ordered the documents be produced only to the

mental defects that might have affected, either his ability to recall or his truthfulness, the defense was entitled to such records for impeachment.

## C. THE COURT ERRED IN RESTRICTING CROSS-EXAMINATION ON DE LA CRUZ'S MENTAL STATE.

During the cross-examination of de la Cruz, the court sustained several government objections that attempted to probe de la Cruz's mental condition at the time he obtained services from Ms. Caulder. For example, although de la Cruz admitted he had been suffering from chronic depression, the court sustained objections to questions regarding his hospitalization in October 1997. The court sustained an objection to whether de la Cruz suffered a psychotic episode in October 1997. E.R. 113. The court also precluded additional questions regarding de la Cruz's medical regimen after he denied taking lithium. E.R. 112. The district court abused its discretion and deprived Ms. Caulder of her Sixth Amendment right to cross-examination.

Wide latitude should be given to cross-examination designed to test the credibility of a prosecution witness. Davis v. Alaska, 415 U.S. 308, 315-17 (1974). Because a witness' credibility always is relevant, evidence tending to contradict any part of a witness' testimony is relevant for impeachment. See Olden v. Kentucky, 488 U.S. 227, 230-32 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986). A limitation on cross-

---

court, in camera. E.R. 17-18, 20.

29

examination violates the Confrontation Clause if it "limits relevant testimony and prejudices the defendant." United States v. Bensimon, 172 F.3d 1121, 1128 (9th Cir. 1999)(quoting United States v. Shabani, 48 F.3d 401, 403 (9th Cir. 1995)).

As explained supra at, a defendant may impeach a witness with relevant evidence of mental disease or defect. A history of mental illness is such a defect.

The district court improperly sustained limitations on questions which sought to explore whether de la Cruz suffered from more severe mental disorders. The court's limitations on cross-examination by the defense left the jury with the information that de la Cruz had been depressed, but that his condition had been worsened by his relationship with Ms. Caulder. E.R. 114. The court's restrictions on cross-examination were improper for two reasons. First, as with the records of mental illness, de la Cruz's mental condition was a legitimate area for inquiry and impeachment. Second, the court improperly restricted cross-examination, because de la Cruz's own testimony opened the door to such impeachment. See United States v. Green, 648 F.2d 587, 596, n.12 (9th Cir. 1981). De la Cruz repeatedly asserted that his current mental problems had been caused by Ms. Caulder who abused, manipulated, and "tortured" him. E.g. 455-57, 465-66, 472-74, 526, 588-89. This testimony occurred both on direct examination and on cross-examination. De la Cruz asserted, among other things, that Ms. Caulder was responsible for a decline in

his mental ability and physical ailments as well.  While de la
Cruz admitted that he had suffered from some mental problems
before he began his five-year relationship with Ms. Caulder, he
asserted that she exacerbated his pre-existing mental condition.
 He also blamed her for starting his panic attacks.  RT 584.
Thus, De la Cruz's testimony opened the door to impeachment
regarding his mental history and condition prior to his
involvement with Ms. Caulder, if only to rebut his testimony that
she was to blame for all his difficulties.  See United States v.
Mendoza-Prado, 314 F.3d 1099, 1105 (9th Cir. 2002)(defendant
opened the door to evidence of videotape on which he bragged
about prior misconduct, when he testified that he was a busy
family man who lacked the time, inclination and courage to sell
cocaine)

    The court's truncation of Ms. Caulder's Sixth Amendment
right to cross-examination was not harmless.  A trial error "is
harmless only if there is 'fair assurance' that the verdict was
not substantially swayed by the error."  United States v. Cruz-
Garcia, 344 F.3d 951, 957 (9th Cir. 2003)(quoting United States
v. Bauer, 132 F.3d 504, 510 (9th Cir. 1997).  Michael de la Cruz
was the government's most important witness, and his testimony
was relevant both to the charge of bankruptcy fraud and to the
tax offenses.  Indeed, without his testimony, the government
would have had no evidence that Ms. Caulder obtained any monies
in 2001, because of the money she received during that year came

31

from de la Cruz.  Furthermore, his testimony regarding his intention to gift Ms. Caulder with money, was critical to the tax charges.  He asserted at trial, contrary to his prior writings, that the monies he transferred to Ms. Caulder were payments, made under duress.  RT 472-74, 537, 568.  This Court should reverse the judgment of conviction.

## D. THE DISTRICT COURT'S SENTENCE WAS UNREASONABLE.

Appellant's sentence must be reversed, because the district court failed to consider either the factors under 18 U.S.C. § 3553 or the fundamental, controlling principle of 18 U.S.C. § 3553(a), the parsimony principle, in imposing a sentence of 30 months.  The court did not consider that the sentence imposed be "sufficient, but not greater than necessary," to assure the objectives of section 3553(a)(2).

After Booker, the Court's duty at the time of sentencing is to impose the sentence which is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to fulfill the purposes of sentencing listed under id.(a)(2).  United States v. Booker, 543 U.S. 220, 259 (2005).  The surviving provisions of the Sentencing Reform Act are governed by this key provision:  the actual sentence imposed must never be "greater than necessary" -- although it also must be "sufficient" -- to achieve the purposes of sentencing.  The statute identifies the purposes of sentencing as just punishment, general and specific deterrence, and

32


rehabilitation.  18 U.S.C. § 3553(a)(2)(A - D).  The Act also
mandates that the sentencing court "consider" a number of listed
factors before choosing that sentence.[4]  Nothing in the statute
gives greater weight to the guidelines as opposed to any other
factor.  After Booker, in other words, a sentence within the
guideline range may not be "necessary" to achieve the
Congressionally defined purposes: (A) "just punishment" in light
of "the seriousness of the offense"; (B) general and specific
"deterrence;" (C) incapacitation "to protect the public"; and (D)
any "needed" rehabilitation and "correctional treatment" of the
offender.  18 U.S.C. § 3553(a)(2).

    The district court's duty is to impose not a "reasonable"
sentence, but one which is "sufficient" to achieve these four
objectives, without being "greater than necessary."  Accordingly,
the advisory guideline range does not provide for a presumptive
sentence; at most, the advisory guideline range is the starting
point for determining the minimally sufficient sentence.  United

---

[4] Section 3553(a) contains a dozen factors that the court, "in
determining the particular sentence," must consider.  In addition
to the six objectives found in the four clauses of subsection
(a)(2), those mandatory points for consideration are:  (1) "the
nature and circumstances of the offense," and "the history and
characteristics of the offender"; (2) the general purposes of
sentencing; (3) the "kinds of sentences available"; (4) whatever
sentence types and ranges are called for by the Guidelines; (5)
"any pertinent policy statement" of the U.S. Sentencing
Commission (these include most definitions of grounds for
departure); (6) "the need to avoid unwarranted sentence disparity
among defendants with similar records who have been found guilty
of similar conduct"; and (7) "the need to provide restitution to
any victim."

States v. Menyweather, 431 F.3d 692, 696, 701-02 (9th Cir. 2005);
United States v. Cantrell, 433 F.3d 1269, 1280 (9th Cir. 2006).

The question of the weight to be accorded to the advisory
guidelines, and the effect of the parsimony principle, may be
resolved by the Supreme Court's decisions in Rita v. United
States, No. 06-5754, and Claiborne v. United States, No. 06-5618,
argued on February 20, 2007. This Court has held its own en banc
opinion in United States v. Carty, 453 F.3d 1214 (9th Cir. 2006),
petition for rehearing en banc granted, and United States v.
Zavala, 443 F.3d 1165 (9th Cir. 2006), petition for rehearing en
banc granted, pending the decisions in Claiborne and Rita.

Regardless of the outcome, however, the record demonstrates
that the district court relied exclusively on the advisory
guidelines. The court did not consider the parsimony principle.
Indeed, the court did not even mention the factors under section
3553(a)(2), until tardily invited to so state by the government.
E.R. 168. Instead, the court reviewed the guideline
calculations, heard argument from both parties, and then imposed
a midrange guideline sentence. The court stated merely that it
was basing its sentence on a "large bankruptcy fraud and a very
large tax fraud or fax, failure to pay." E.R. 154. The court
gave no indication that it considered the history and character
of the defendant. Nor did the court apparently consider any
factor under § 3553(a)(2) other than the nature of the offense.
There is no indication that the court considered any of the

section 3553 factors, let alone its duty to impose the sentence that is minimally sufficient to achieve those factors.  For these reasons, this Court should reverse and remand for resentencing.

## IX. CONCLUSION

Based upon the foregoing arguments, this Court should vacate appellant's convictions and sentence.

Dated: March 12, 2007

Respectfully submitted,

KAREN L. LANDAU
Attorney for Appellant
Sharon Caulder

# STATEMENT OF RELATED CASES

Undersigned counsel is not aware of any related cases.

# CERTIFICATE OF COMPLIANCE

I certify that:

_x_  1.  Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Cir.
R. 32-1, the attached opening brief is:

    ____ Proportionately spaced, has a typeface of 14 points or
    more and contains _____ words;

    or is

    _x_ Monospaced, has 10.5 or fewer characters per inch and
    contains 8,838 words or ____ lines of text (opening briefs
    must not exceed 14,000 words or 1300 lines of text);

    or

____ 2.  The attached brief is not subject to the type-volume
limitations of Fed. R. App. P. 32(a)(7)(B) because:

    ____ This brief complies with Fed. R. App. P. 32(a)(1)-(7Z)
and is a principal brief of no more than 30 pages or a reply
brief of no more than 15 pages. Ninth Cir. R. 32-1.

Karen L. Landau

PROOF OF SERVICE

I, the undersigned, declare:

I am a citizen of the United States, over the age of 18 years and not a party to the within cause; my business address is 2626 Harrison St., Oakland, California 94612.

On March 14, 2007, I served two copies of the attached

Appellant's Opening Brief

and one copy of the attached

Appellant's Excerpts of Record

upon the interested parties herein, by causing a true and correct

copy of said documents to be enclosed in a sealed envelope and

deposited in the United States mail at Oakland, California,

addressed as follows:

Amber Rosen, Esq.
Asst. United States Attorney
150 Almaden Blvd., Suite 900
San Jose, CA 95113

I declare under penalty of perjury that the foregoing is

true and correct and that this declaration was executed on March

14, 2007.

Karen L. Landau